**EXHIBIT "A"**

**Intercreditor and Subordination Agreement dated September 30, 2014**

930577

## INTERCREDITOR AND SUBORDINATION AGREEMENT

**THIS INTERCREDITOR AND SUBORDINATION AGREEMENT** (this "**Agreement**"), is entered into to be effective as of September 30, 2014, by and among HALL CA-NV, LLC, a Texas limited liability company, as the first lienholder ("**Senior Lender**"), LADERA DEVELOPMENT, LLC, a Nevada limited liability company, as the junior lienholder ("**Junior Lender**"), and NEW CAL-NEVA LODGE, LLC, a Nevada limited liability company ("**Borrower**").

### RECITALS

A.     CAL NEVA LODGE, LLC, a Nevada limited liability company ("**CAL NEVA**") is the direct owner of 100% of the equity interests ("**Ownership Interests**") in the Borrower. Borrower is the owner of that certain real property located in the City of Crystal Bay, Washoe County, Nevada, and in adjoining land located in Placer County, California, more fully described in **Exhibit A** attached hereto and made a part hereof (the "**Land**"). The Land and the improvements located on the Land (the "**Improvements**") are collectively referred to herein as the "**Property**."

B.     Senior Lender has made a loan to Borrower in the amount of $29,000,000.00 (the "**Senior Loan**") pursuant to that certain Construction Loan Agreement (the "**Senior Loan Agreement**"), dated of even date herewith, between, among others, Senior Lender and Borrower. The Senior Loan is evidenced by a Promissory Note dated of even date herewith, made by Borrower, payable to the order of Senior Lender in the principal amount of the Senior Loan (the "**Senior Note**"). The Senior Note is secured by, among other documents, (i) that certain Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents and Leases to be recorded in the real property records of Placer County, California made by Borrower for the benefit of Senior Lender and encumbering the Property, and (ii) that certain Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents and Leases to be recorded in the real property records of Washoe County, Nevada, made by Borrower for the benefit of Senior Lender and encumbering the Property (together, the "**Senior Security Instrument**"). The Senior Loan and the other Senior Debt (as such term is defined below) is guaranteed by those certain Guaranty Agreements, each dated of even date herewith (together the "**Senior Guaranty**"), given by William Criswell and Robert Radovan (together, the "**Senior Guarantors**") in favor of Senior Lender. The Senior Loan Agreement, the Senior Note, Senior Security Instrument, the Senior Guaranty, and any other document executed by Borrower, Senior Guarantors or any other party to evidence, govern or secure the Senior Debt, as each of the same may be amended, supplemented, restated, modified, refinanced, replaced, extended or renewed from time to time, are hereinafter collectively referred to as the "**Senior Loan Documents**".

C.     Junior Lender has made a loan to Borrower in the principal amount of $6,000,000.00 (the "**Junior Loan**") pursuant to that certain Loan Agreement (the "**Junior Loan Agreement**"), dated September 30, 2014 between Junior Lender and Borrower. The Junior Loan is evidenced by a Promissory Note dated September 30, 2014 made by Borrower, payable to the order of Junior Lender in the principal amount of the Junior Loan (the "**Junior Note**"). The Junior Note is secured by (i) that certain second lien Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing to be recorded in the real property records of Placer County, California made by Borrower for the benefit of Junior Lender and encumbering the Property, (ii) that certain second lien Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing to be recorded in the real property records of Washoe County, Nevada, made by Borrower for the benefit of Senior Lender and encumbering the Property (together, the "**Junior Security Instrument**"), and (iii) a Pledge and Security Agreement of the Ownership Interests executed by CAL NEVA (the "**Junior Pledge**"). The Junior Loan is not secured in any way by guaranty agreements from the Senior Guarantors. The Junior Loan Agreement, the Junior Note, Junior Security Instrument, the Junior Pledge and any other document executed by Borrower or any guarantor to evidence, govern or

secure the Junior Loan, as each of the same may be amended, supplemented, restated, modified, refinanced, replaced, extended or renewed from time to time, are hereinafter collectively referred to as the "**Junior Loan Documents**".

D.      The Senior Loan, together with (i) all additional loans or advances under or in connection with the Senior Loan Documents not to exceed in the aggregate (together with the $29,000,000.00 principal contemplated in the Senior Loan Agreement) the sum of $34,000,000.00 (the "**Senior Loan Limit**"), (ii) all accrued interest, fees, costs and other amounts incurred under or in connection with the Senior Loan Documents, in each case under clause (i) or (ii) hereof, whether created directly or acquired by the Senior Lender by assignment or otherwise, whether now existing or hereafter created, arising or acquired, absolute or contingent, joint or several, due or to become due, whether incurred before or after the commencement of an Insolvency Proceeding (and whether allowable in an Insolvency Proceeding), including without limitation, default interest, post-petition interest, prepayment fees, exit fees, yield maintenance (or make-whole) premiums, and late charges, are hereinafter defined as the "**Senior Debt**".

E.      The Junior Loan, together with (i) all additional loans or advances under or in connection with the Junior Loan Documents, (ii) all accrued interest, fees, costs and other amounts incurred under or in connection with the Junior Loan Documents, in each case under clause (i) or (ii) hereof, whether created directly or acquired by the Junior Lender by assignment or otherwise, whether now existing or hereafter created, arising or acquired, absolute or contingent, joint or several, due or to become due, whether incurred before or after the commencement of an Insolvency Proceeding (and whether allowable in an Insolvency Proceeding), including without limitation, default interest, post-petition interest, prepayment fees, exit fees, yield maintenance (or make-whole) premiums, and late charges, are hereinafter defined as the "**Junior Debt**".

F.      To induce Senior Lender to make the Senior Loan, Junior Lender has agreed to fully subordinate the Junior Debt and Junior Loan Documents, and the liens and security interests evidenced thereby, to the Senior Loan and the Senior Loan Documents, and the liens and security interests evidenced thereby, pursuant to the terms and conditions of this Agreement.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing, Senior Lender, Junior Lender, and Borrower hereby covenant and irrevocably agree as follows:

1.      **Subordination; Management of Property**.

(a)      The Junior Debt is subordinate to the Senior Debt and the Junior Security Instrument and any and all liens securing the Junior Loan are subordinate to the Senior Security Instrument and any and all liens securing the Senior Loan.  Notwithstanding the date, time, method, manner, or order of grant, attachment or perfection of any lien or charge on the Property, or any other collateral, securing the Senior Debt and notwithstanding any provision of the Uniform Commercial Code ("**UCC**"), or any other applicable law, or the Junior Loan Documents, Senior Lender, Junior Lender, and Borrower agree that the Senior Loan Documents, and all supplements, amendments, modifications, renewals, replacements, consolidations and extensions of and to them (except for any such supplements, amendments, modifications, renewals, replacements, consolidations or extensions which create or result in aggregate loans or advances in excess of the Senior Loan Limit), shall unconditionally be and remain at all times a lien or charge on the Property prior to and superior to the Junior Loan Documents, and to all rights and privileges of Junior Lender under the Junior Loan Documents.  The Junior

Loan Documents, together with all rights and privileges of Junior Lender under the Junior Loan Documents, are hereby unconditionally subjected and made subordinate to the lien or charge of the Senior Loan Documents in favor of Senior Lender. Junior Lender hereby intentionally waives, relinquishes and subordinates the priority and superiority of the Junior Loan Documents and the rights, privileges and powers of Junior Lender thereunder, including without limitation rights to any insurance proceeds or condemnation award and similar rights or interests of Junior Lender under the Junior Loan Documents, in favor of the Senior Security Instrument and any instrument modifying or amending the same or entered into in substitution or replacement thereof. The Junior Loan Documents shall be subject and subordinate to any and all advances made and expenses incurred, with interest thereon, pursuant to the Senior Loan Documents. Junior Lender further declares, agrees and acknowledges that Senior Lender, making disbursements under the Senior Loan Documents, has no obligation or duty to, nor has Senior Lender represented that it will, see to the application of such proceeds by the person (or entity) or persons (or entities) to whom they are disbursed by Senior Lender, and any application or use of such proceeds for purposes other than those provided for in the Senior Loan Documents shall not defeat the subordination made in this Agreement, in whole or in part.

(b)     Junior Lender further covenants and agrees the Junior Debt, howsoever evidenced and whether now existing or hereinafter incurred, shall be subordinate and junior in right of payment to all Senior Debt. The holder of the Senior Debt shall first be finally and irrevocably paid in cash an aggregate amount equal to the principal of the Senior Loan, accrued and unpaid interest due thereon, and all other costs, fees, expenses and/or obligations now or hereafter owning thereunder, before any payment of any character, whether in cash, securities or other property, shall be made on account of the Junior Debt or otherwise to or for the benefit of the holder or holders of Junior Debt; provided, however, that notwithstanding the foregoing, Junior Lender may commence foreclosure proceedings or take other action against the Ownership Interests so long as Junior Lender complies with the requirements set forth in **Section 12(b)** of this Agreement. Subject to the proviso in the immediately preceding sentence, any payment of any character, whether in cash, securities or other property which would otherwise, but for the provisions of this **Section 1**, be payable or deliverable in respect of the Junior Debt or otherwise shall be paid or delivered directly to the holder of the Senior Debt, until all the Senior Debt shall have been paid in full. No reimbursement, payment, direct or indirect, or disbursement of other property or assets of Borrower (except with respect to the Ownership Interests in compliance with the requirements set forth in **Section 12(b)** of this Agreement) shall be made by Borrower on account of the Junior Debt or received, accepted, retained or applied by the Junior Lender (except for the account and benefit of Senior Lender, which shall be held in trust for Senior Lender) until such time as the Senior Debt has been finally and irrevocably paid in full in cash.

(c)     Notwithstanding the provisions of **Section 1(b)** above or any other provision of this Agreement to the contrary, except during any period commencing with the occurrence and ending with the cure of a default or Event of Default under the Senior Loan Documents, Junior Lender may receive and retain regularly scheduled interest payments due under the Junior Loan Documents; provided, (i) no amounts are currently due and payable to Senior Lender at the time of such interest payment to Junior Lender, and (ii) such funds being paid to Junior Lender are not contemplated or covered in the budget attached hereto as **Exhibit D** (the "**Budget**") and do not represent funds disbursed from the Senior Loan.

(d)     Junior Lender acknowledges that Senior Lender has certain exclusive rights (with respect to the Junior Lender under the Junior Loan Documents, but not with regard to Borrower whether or not Junior Lender has acquired the Ownership Interests through foreclosure or otherwise) under the Senior Loan Documents with respect to management and control of the Property.  Junior Lender agrees not to challenge the method, manner, time, place or terms, of any disposition of the Property by Senior Lender to the extent done in compliance with the Senior Loan Documents and applicable laws.    Notwithstanding any rights or remedies available to Junior Lender under applicable law or under any Junior Loan Document, so long as the Senior Debt is outstanding, Junior Lender shall not be permitted to foreclose upon its security interest in any portion of the Property, or to exercise similar remedies with respect thereto, and only Senior Lender shall have the right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of the Property.  Junior Lender shall not in any manner interfere with Senior Lender's security interests in the Property unless and until all of the Senior Debt is no longer outstanding.  Junior Lender agrees not to challenge the method, manner, time, place or terms, of any disposition of the Property by Senior Lender in compliance with applicable laws.  Accordingly, should Senior Lender elect to exercise its rights and remedies with respect to any of the Property, Senior Lender may proceed to do so without regard to any interest of Junior Lender for any disposition of the Property.

2.      **Junior Lender's Waivers; No Contesting By Junior Lender**.

(a)     Junior Lender agrees that Senior Lender may at any time and from time to time, without the joinder or consent of Junior Lender, without incurring responsibility to Junior Lender, without impairing the covenants and agreements of Junior Lender hereunder: (1) change the manner, place or terms of, and/or change or extend the time of payment of, renew or alter, any of the indebtedness evidenced by the Senior Note or any of the other Senior Loan Documents (except for any such change, extension, renewal, or alteration which creates or results in aggregate loans or advances in excess of the Senior Loan Limit), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Agreement shall apply to the Senior Loan Documents so changed, extended, renewed or altered; (2) change, extend or waive the time for performance of or compliance with any covenant or agreement contained in the Senior Note, the Senior Security Instrument or any of the other Senior Loan Documents, whether presently existing or hereafter, entered into; (3) accelerate the maturity of all or any portion of the Senior Debt as provided in the Senior Note, the Senior Security Instrument or any of the other Senior Loan Documents; (4) modify or amend the Senior Note, the Senior Security Instrument or any of the other Senior Loan Documents in any respect, including without limitation increasing the Senior Debt (the parties agree that such increase shall constitute part of the Senior Debt and the Junior Debt shall be subordinated to the aggregated Senior Debt as provided under the terms of this Agreement), except for any such modification or amendment which creates or results in aggregate loans or advances in excess of the Senior Loan Limit; (5) fail to record, perfect or protect, sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure or howsoever securing the Senior Debt or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst; (6) exercise or refrain from exercising any rights against Borrower or any other person or entity (including any guarantors of the Senior Note) or otherwise act or refrain from acting; (7) settle or compromise any of the indebtedness evidenced by the Senior Note or any other Senior Loan Document, any security therefor or any liability

(including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or, not) of Borrower to the creditors of Borrower (including Senior Lender); (8) apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of Borrower to Senior Lender regardless of what liability or liabilities of Borrower remain unpaid; and/or (9) consent to or waive any breach of, or any act, omission or default under, or modify or amend any provisions of, the Senior Loan Documents. Senior Lender shall deliver to Junior Lender, copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender).

(b)     Junior Lender also waives, to the fullest extent permitted by law, all rights to require Senior Lender to (1) proceed against Borrower or any guarantor(s) of Borrower's payment or performance with respect to all or any portion of the Senior Debt, (2) if Borrower, or any guarantor is a partnership, proceed against any general partner of Borrower or, the guarantor, (3) proceed against or exhaust any collateral held by Senior Lender to secure the repayment of all or any portion of the Senior Debt, or (4) pursue any other remedy it may now or hereafter have against Borrower, or, if Borrower is a partnership, any general partner of Borrower.

(c)     Junior Lender agrees that it will not at any time contest the validity, perfection, priority or enforceability of any of the Senior Debt, any of the Senior Loan Documents, or any of the liens and security interests of Senior Lender in the Property or other collateral securing the Senior Debt.

3.     **Junior Lender's Covenants**.  Junior Lender further covenants and agrees as follows:

(a)     Junior Lender shall release insurance proceeds and condemnation awards, to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Loan Documents, in the same manner as Senior Lender, under, the terms and provisions of the Senior Loan Documents, so that no conflicts are created by and among Senior Lender, Junior Lender, or others in the application of insurance proceeds or condemnation awards.  Senior Lender has the sole and exclusive right, as against Junior Lender, to adjust settlement of insurance claims under the insurance policies in the event of any covered loss or destruction. All proceeds of such insurance related to the Property shall inure to the Senior Lender, and Junior Lender shall cooperate (if necessary) in a reasonable manner in effecting the payment of such insurance proceeds to Senior Lender.  In the event Senior Lender permits the Borrower to utilize the proceeds of insurance to replace any part of the Property, the consent of Senior Lender shall be deemed to include the consent of Junior Lender.

(b)     If Junior Lender shall at any time hereafter acquire, by indemnification, subrogation (for example, by payment of real estate taxes) or otherwise, any lien, right, title or other interest in or to the Property, that lien, right, title or other interest shall automatically be subject and subordinate to the Senior Security Instrument as provided herein.  If due to any applicable law or otherwise, such lien, right, title or other interest does not automatically subordinate to the Senior Security Instrument, Junior Lender

agrees to execute any document or subordination that effects the intent of the above sentence and this Agreement.

(c)     No rents will be collected by or for Junior Lender.

(d)     For so long as this Agreement is in effect, Junior Lender will not require, or accept, guarantees from the Senior Guarantors or affiliates of Senior Guarantors.

4.     **Senior Lender Representations**.  Senior Lender hereby represents, warrants and certifies to Junior Lender that, as of the date of this Agreement: (i) this Agreement has been duly authorized, executed and delivered by Senior Lender; (ii) the documents described on **Exhibit B** attached hereto are all of the Senior Loan Documents, true, correct and complete copies of which have been delivered to Junior Lender; and (iii) the Senior Loan Documents have not been modified, amended or terminated except as disclosed on **Exhibit B**.

5.     **Junior Lender Representations**.  Junior Lender hereby represents, warrants and certifies to Senior Lender that, as of the date of this Agreement: (i) this Agreement has been duly authorized, executed and delivered by Junior Lender;  (ii) the documents described on **Exhibit C** attached hereto are all of the Junior Loan Documents, true, correct and complete copies of which have been delivered to Senior Lender; (iii) the Junior Loan Documents have not been modified, amended or terminated except as disclosed on **Exhibit C**; and (iv) that none of the Junior Debt has been assigned or otherwise transferred to any person or entity and that the Junior Lender is the sole owner of all of the Junior Debt.

6.     **Senior Loan Documents**.   Junior Lender has reviewed the Senior Loan Documents identified on **Exhibit B** attached hereto and incorporated herein by this reference and hereby approves of and consents to the Senior Debt and such Senior Loan Documents.

7.     **Junior Loan Documents**.   Senior Lender has reviewed the Junior Loan Documents identified on **Exhibit C** attached hereto and incorporated herein by this reference and hereby approves of and consents to the Junior Debt and such Junior Loan Documents.

8.     **Amendment of Junior Loan Documents**.   Without Senior Lender's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed, Junior Lender will not amend or modify the Junior Debt or the Junior Loan Documents in any way that will: (A) increase the maximum principal amount of the Junior Debt or increase the rate of interest or increase any of the fees, costs, or other amounts currently set forth in the Junior Loan Documents, (B) increase the amount or number of payments required by the Junior Loan Documents, (C) cross-default the Junior Debt with any loan other than the Senior Loan, (D) cross-collateralize the Junior Debt with any other loan, (E) add additional default provisions to any of the Junior Loan Documents or delete or shorten existing notice, grace and cure periods for any default, (F) shorten the maturity of the Junior Loan or any other portion of the Junior Debt, or (G) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge. Junior Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Junior Loan Documents (including any side letters, waivers or consents entered into, executed or delivered by Junior Lender) within a reasonable time after any of such applicable instruments have been executed by Junior Lender.  Notwithstanding anything contained herein or in the Junior Loan Documents to the contrary and notwithstanding any amendment or

modification to the Junior Loan Documents, the Junior Debt shall remain in all ways subordinate to the Senior Debt.

9.    **Cross-Default**.  The Junior Debt is cross-defaulted with the Senior Debt.  An event of default under the Junior Debt shall be an event of default under the Senior Loan Documents.  An event of default under the Senior Debt shall be an event of default under the Junior Loan Documents.

10.    **Notices of Default**.

(a)    Junior Lender shall, simultaneously with delivery to Borrower, give Senior Lender copies of any notices given to the Borrower under the Junior Loan Documents of "Events of Default" or notices of events that with the passage of time and failure to cure, would result in the occurrence of a "default" or "Event of Default" under the Junior Loan Documents, simultaneously with giving such notices to Borrower.

(b)    Senior Lender shall, simultaneously with delivery to Borrower, give Junior Lender copies of any notices given to the Borrower under the Senior Loan Documents of "Events of Default" or notices of events that with the passage of time and failure to cure, would result in the occurrence of a "default" or "Event of Default" under the Senior Loan Documents, simultaneously with giving such notices to Borrower.

11.    **Cure by Other Lenders; Waiver of Subrogation**.

(a)    Senior Lender agrees that Junior Lender shall have the right, but not the obligation, after the receipt of a default notice set forth above to cure the default specified in said notice within the same cure period as is afforded to the Borrower under the Senior Loan Documents or Senior Lender default notice, as applicable, plus an additional 30 days to cure the default in question, except for monetary defaults, in which case the additional cure period will only be 10 days.  Notwithstanding anything to the contrary contained in this Agreement, Junior Lender shall not have any obligation to cure any such default.  It is expressly agreed that the curing by Junior Lender of any event of default under the Senior Loan Documents or the taking of any action by Junior Lender in connection therewith shall not be deemed an assumption by Junior Lender of any of the Borrower's obligations under the Senior Loan Documents.  Senior Lender shall accept performance by Junior Lender of any cure of a default within the same cure period as is afforded to Borrower under the Senior Loan Documents or Senior Lender default notice, as applicable, to cure the default in question as though performed by Borrower, plus the 30 day or 10 day extension, as applicable, provided above.  Notwithstanding any such performance by Junior Lender of any such obligations of Borrower, Junior Lender hereby absolutely and irrevocably waives, to the fullest extent permitted by applicable law, any rights it may have, by contract, at law or in equity, to be subrogated to Senior Lender's rights against Borrower under the Senior Loan Documents or to Senior Lender's liens on any of the Property.

(b)    Junior Lender agrees that Senior Lender shall have the right, after the receipt of a default notice to cure the default specified in said Junior Lender default notice within the same cure period as is afforded to the Borrower under the Junior Loan Documents or the Junior Lender default notice, as applicable, plus an additional 30 days to cure the default in question, except for monetary defaults, in which case the additional cure period will only be 5 days.  Notwithstanding anything to the contrary contained in

this Agreement, Senior Lender shall not have any obligation to cure any such default. It is expressly agreed that the curing by Senior Lender of any event of default under the Junior Loan Documents or the taking of any action by Senior Lender in connection therewith shall not be deemed an assumption by Senior Lender of any of Borrower's obligations under the Junior Loan Documents. Junior Lender shall accept performance by Senior Lender of any cure of a default within the same cure period as is afforded to Borrower under the Junior Loan Documents or the Junior Lender default notice, as applicable, to cure the default in question as though performed by Borrower, plus the 30 day or 10 day extension, as applicable, provided above.

12.      **Junior Lender Standstill**.

(a)      Notwithstanding Junior Lender's rights under applicable law or any provision of the Junior Loan Documents to the contrary, Junior Lender hereby acknowledges and agrees that, except as specifically set forth in this Section 12, it shall not take any Enforcement Action (as hereafter defined), until, in any such case, 91 days following the satisfaction in full of the Senior Debt. For purposes of this Agreement, **"Enforcement Action"** in this Section 12 means the commencement of the exercise of any remedies against Borrower or any guarantor or any indemnitor of the Senior Debt, including, without limitation, (i) the taking, accepting or receiving from or for the account of the Borrower, by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by the Borrower with respect to the whole or any part of the Junior Debt, (ii) the commencement of any litigation or proceeding, (iii) the commencement of any foreclosure proceeding, (iv) the exercise of any power of sale, the sale by advertisement, the taking of a deed or assignment in lieu of foreclosure, (v) the obtaining of a receiver or the taking of any other enforcement action against, or (vi) the taking of possession or control of, any of the Property, but specifically excludes (x) requests and demands made upon Borrower by delivery of notices to Borrower, and (y) assertion or enforcement of any right of Junior Lender to receive payment from proceeds of a foreclosure sale of any Property incident to foreclosure of the liens or security interests of the Senior Loan Documents which may remain after payment of costs and expenses of such foreclosure and payment and satisfaction in full of the Senior Debt. Further, until 91 days following satisfaction in full of the Senior Debt, Junior Lender shall not institute any judicial or administrative proceeding against Borrower, any guarantor or indemnitor of the Senior Debt or Senior Lender which directly or indirectly would interfere with or delay the exercise by Senior Lender of its rights and remedies in respect of the Property, or any part thereof or under the Senior Loan Documents or this Agreement. The foregoing provisions of this **Section 12 (a)** shall not be deemed either to (a) limit or prevent Junior Lender from receiving the interest payments described in Section 1(c) above, or (b) limit or prevent Junior Lender from imposing any default interest rate under the Junior Loan based on a default by Borrower under the Junior Loan Documents.

(b)      Notwithstanding the above to the contrary, (i) with respect to the Ownership Interests only, Junior Lender may without Senior Lender's consent and only after either (x) Construction Completion (herein after defined) or (y) the occurrence of an Event of Default under the Senior Loan Documents, commence foreclosure proceedings or exercise any power of sale, the sale by advertisement, or take any other action involving the Ownership Interests only; provided, Borrower's obligations and debt (as described therein) under the Senior Debt shall be unaffected by such change in ownership of the Ownership Interests, and Junior Lender shall have no right to cause Borrower to

seek relief under any Insolvency Proceeding, (ii) with respect to the Ownership Interests only, Junior Lender may with Senior Lender's prior consent and only after Construction Completion, commence any litigation or proceeding against Borrower, guarantor or any director, member or partner of Borrower other than such action in connection with realizing upon the Ownership Interests, (iii) with respect to the Ownership Interests only, Junior Lender may make requests and demands with respect to the Ownership Interests upon Borrower by delivery of notices to Borrower, and (iv) Junior Lender may assert or enforce any right of Junior Lender to receive payment from proceeds of a foreclosure sale of any Property incident to foreclosure of the liens or security interests of the Senior Loan Documents which may remain after payment of costs and expenses of such foreclosure and payment and satisfaction in full of the Senior Debt.   For purposes of this Agreement, "**Construction Completion**" shall means the satisfaction of all of the following requirements with respect to the Property: (a) receipt by Senior Lender of a certificate of substantial completion executed by Borrower, the general contractor and the architect stating that the Improvements are substantially complete in accordance with the Plans and Specifications (as defined in the Senior Loan Agreement) and all Laws (as defined in the Senior Loan Agreement) as set forth in the Senior Loan Agreement; (b) receipt by Senior Lender of an affidavit signed by the general contractor stating that all amounts associated with the Construction (as defined in the Senior Loan Agreement) due to it under its construction contract have been paid, and an unconditional waiver of mechanic's liens upon final payment releasing all of its liens on the Property; (c) receipt by Senior Lender of a certificate of occupancy (or its equivalent) issued by the applicable governmental authorities, free and clear of mechanics' liens and security interests, and ready for occupancy; (d) receipt by Senior Lender of all items set forth under that certain Post-Closing Agreement executed by Borrower of even date herewith; and (e) receipt by Senior Lender of evidence of approval from Franchisor (as defined in the Senior Loan Agreement) and their acceptance of the Property.

(c)     In the event of default under the Senior Debt, which is not cured within any applicable cure period (including the extension thereof under Section 11(a) for cure by Junior Lender), Senior Lender shall be able to immediately commence the exercise of any rights and remedies available under the Senior Loan Documents, law or equity, against the Property, Borrower or any guarantor or any indemnitor of the Senior Debt, including, without limitation, the acceleration of all or any portion of the Senior Debt, the triggering of the lock box or the exercise of any of its rights related to any accounts or deposits of Borrower or any Senior Guarantor that are collateral for the Senior Debt, the appointment of a receiver to any part of the Property, the commencement of any litigation or proceeding, the commencement of any foreclosure proceeding, the exercise of any power of sale, the sale by advertisement, the taking of a deed or assignment in lieu of foreclosure.  Notwithstanding the foregoing or any other provision of this Agreement, (i) Senior Lender agrees to accept payment in full of the Senior Debt from or on behalf of Junior Lender at any time prior to completion of any judicial or non-judicial foreclosure under the Senior Security Instruments assuming such payment is in the full amount owed to Senior Lender; and (ii) Senior Lender agrees to reinstate the Senior Debt (including, without limitation, with respect to both of the Senior Security Instruments) notwithstanding any acceleration of all or any portion of the Senior Debt, upon payment and/or performance by or on behalf of Junior Lender which would satisfy the requirements for reinstatement under California Civil Code Section 2924c(a)(1).

13.     **Insolvency Proceedings**.

(a)     For purposes of this Agreement, "**Insolvency Proceeding**" means any proceeding under Title 11 of the United States Code (11 U.S.C. Sec. 101 et. seq.) or any other insolvency, liquidation, reorganization or other similar proceeding concerning Borrower or guarantor, any action for the dissolution of Borrower, any proceeding (judicial or otherwise) concerning the application of the assets of Borrower, for the benefit of its creditors, the appointment of or any proceeding seeking the appointment of a trustee, receiver or other similar custodian for all or any substantial part of the assets of Borrower or any other action concerning the adjustment of the debts of Borrower, the cessation of business by Borrower, except following a sale, transfer or other disposition of all or substantially all of the assets of Borrower in a transaction permitted under the Senior Loan Documents, if any.

(b)     Notwithstanding anything to the contrary contained in this Agreement, during the continuance of any Insolvency Proceeding, the Senior Debt shall first be indefeasibly paid and satisfied in full in cash before any payment or distribution of cash or other property is made upon the Junior Debt.  In any Insolvency Proceeding, any payment or distribution which may be payable or deliverable with respect to the Junior Debt shall be paid or delivered directly to Senior Lender for application to the payment and satisfaction of the Senior Debt unless and until the Senior Debt shall have been indefeasibly paid and satisfied in full in cash.

(c)     In the event that, notwithstanding the foregoing, in any Insolvency Proceeding any payment or distribution not allowed to be made to Junior Lender hereunder shall be paid or delivered to Junior Lender before the date on which the Senior Debt shall have been indefeasibly paid and satisfied in full in cash, and all of the commitments of Senior Lender to make loans or other extensions of credit to Borrower pursuant to the Senior Loan Documents shall have terminated, Junior Lender shall immediately pay, deliver and assign to Senior Lender any such payment or distribution for application to the Senior Loan Obligations (and while held by Junior Lender, all such payments or distributions so received shall be held in trust by Junior Lender for the benefit of Senior Lender).

(d)     If applicable, Junior Lender agrees to vote for any plan of reorganization approved by Senior Lender in respect of Borrower in any Insolvency Proceeding respecting Borrower; provided, however, that Senior Lender agrees not to unreasonably withhold or delay its consent to Junior Lender's voting for a different plan of reorganization if (i) the different plan is at least as beneficial to Senior Lender (including without limitation with respect to Senior Lender's payment, lien and remedy rights thereunder) as the plan approved by Senior Lender, and (ii) Junior Lender agrees in writing (A) that any payments received by Junior Lender by virtue of such Insolvency Proceeding will be held by Junior Lender in trust for the benefit of Senior Lender until such time as the Senior Debt is satisfied in full, and (B) if the Senior Debt will not be satisfied in full by virtue of such Insolvency Proceeding, promptly pay over to Senior Lender the payments so held in trust up to the amount of the deficiency.

(e)     In any Insolvency Proceeding commenced by or against Borrower or any member of Borrower, Junior Lender shall file a proof of claim with respect to its claims against Borrower or any member of Borrower and shall deliver a copy thereof to Senior Lender together with evidence of the filing with the appropriate court or other authority. If Junior Lender should fail to file any such proof of claim by the 10th business day before the last day for the filing of proofs of claim, then Senior Lender may file such

proof of claim on behalf of Junior Lender. If objection is made to the allowance of any claim of Junior Lender, Senior Lender shall have the right to intervene and fully participate in such proceedings and if such rights are denied and Junior Lender fails to defend such claim, then Senior Lender may defend such claim in the name of Junior Lender.

(f)  In any Insolvency Proceeding commenced by or against Borrower or any member of Borrower, Junior Lender shall be entitled to:

(i)  file, prosecute and defend a proof of claim with respect to the Junior Debt subordinate in all respects to the Senior Debt; and

(ii)  seek non-economic adequate protection orders such as the maintenance of adequate insurance.

(g)  Junior Lender agrees that it shall not join with any creditor in bringing or consenting to any Insolvency Proceeding unless Senior Lender also joins therein or consents thereto in writing.

(h)  Junior Lender agrees that in connection with any Insolvency Proceeding commenced by or against Borrower or any member of Borrower, it will:

(i)  not take any action or vote in any way so as to (A) contest the legality, validity or enforceability of this Agreement or any Senior Loan Document, or (B) contest the Senior Lender's priority position over Junior Lender created hereby;

(ii)  not take any legal action that will impede, interfere with or restrict the exercise by Senior Lender of its rights and remedies under the Senior Loan Documents including, without limitation, not extending the final maturity of and/or forgiving, reducing or cramming-down the Senior Debt or deferring of any required payment in respect of the Senior Debt; provided, however, that Junior Lender may take any legal actions with respect to the Junior Debt that are consistent with the respective rights and obligations of Junior Lender and Senior Lender under this Agreement;

(iii)  not block current payment of any obligations in respect of Senior Debt;

(iv)  not assert or support any requested extension of any exclusivity period for the submission by the Borrower of any plan of reorganization or liquidation unless such extension is assented to or supported by Senior Lender;

(v)  not oppose or object to any sale or lease of any of the Borrower's Property that has been consented to by Senior Lender;

(vi)  not agree or attempt to extend credit to Borrower or any member of Borrower without Senior Lender's prior consent;

        (vii)    not oppose any request by the representative of Borrower's bankruptcy estate to use collateral or cash collateral if Senior Lender has consented to such use; and

        (viii)    take such actions consistent with the terms of this Agreement as may be reasonably requested by Senior Lender to effectuate the subordination and other agreements herein made.

In addition, Junior Lender hereby (A) expressly consents to the granting by the Borrower to the Senior Lender of senior liens and priorities in connection with any post-petition financing by the Senior Lender or cash collateral usage; and (B) agrees that adequate notice of such financing or cash collateral usage to the Junior Lender shall have been provided if the Junior Lender receives notice one business days prior to the entry of any order approving such financing or cash collateral usage. Junior Lender waives any claim or defense it may now or hereafter have arising out of the election by the Senior Lender in any Insolvency Proceeding of any use of cash collateral, any borrowing or any grant of a security interest by the Borrower, as debtor-in possession.

        (i)    Junior Lender agrees not to oppose any post-petition motion filed or supported by Senior Lender, including, without limitation, motions for adequate protection with respect to the Senior Debt, for relief from stay, or for Borrower's application of cash collateral for use in the ordinary course of its business or for post-petition borrowing from Senior Lender.

        (j)    Junior Lender waives the right to contest use of cash collateral or DIP financing where Senior Lender agrees to permit such use of cash collateral or permit DIP financing by a third party. Junior Lender further agrees to subordinate its lien to the lien of a DIP lender, any adequate protection liens granted to Senior Lender, and any carve-out agreed to by Senior Lender. Junior Lender, and any affiliates thereof, agree to not be a DIP lender to Borrower if such DIP financing includes liens with priority equal to or senior to Senior Lender's liens.

    14.    **Notices**.  Any notice or other communication required or permitted to be given shall be in writing addressed to the respective party as set forth below and may be personally served, telecopied e-mailed, or sent by overnight courier or U.S. Mail and shall be deemed given: (a) if served in person, when served; (b) if telecopied or e-mailed, on the date of transmission if before 5:00 p.m. (Dallas, Texas time); provided that a hard copy of such notice is also concurrently sent pursuant to clause (c) or (d) below; (c) if by overnight courier, on the first business day after delivery to the courier; or (d) if by U.S. Mail, on the fourth day after deposit in the mail, postage prepaid, certified mail, return receipt requested.

Notices to Senior        HALL CA-NV, LLC
Lender:              6801 Gaylord Parkway, Suite 101
                 Frisco, Texas 75034
                 Attention:  Michael J. Jaynes
                 Email: MJaynes@hallfinancial.com
                 Telephone: 972-377-1127

                 With a Copy To:

                 Munsch Hardt Kopf & Harr

3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Attention: Josh Botts
Email: jbotts@munsch.com
Telephone: 214-855-7571
Facsimile: 214-978-4331

Notices to Junior
Lender:

Ladera Development, LLC
16475 Bordeaux
Reno, NV  89511
Attention: James Pickett
Email : jpickett@laderaventures.com
Telephone: (775) 398-2266
Facsimile: (775) 849-3130

With a Copy To:

Hopkins & Carley
200 Page Mill Road, Suite 200
Palo Alto, CA  94306
Attention: Garth E. Pickett, Esq.
Telephone: (408) 299-1611
Facsimile: (408) 938-6249

15.    **Assignment**.

(a)    Junior Lender shall have the right to pledge, hypothecate, sell, assign, convey, or otherwise transfer all or any portion of the Junior Debt or any interest in the Junior Debt without the prior written consent of Senior Lender; provided, that (i) prior written notice is provided to Senior Lender and (ii) prior to giving effect to any such pledge, hypothecation, sale, assignment, conveyance or other transfer, the transferee thereof shall execute and deliver to the Senior Lender an agreement substantially the same as this Agreement (or otherwise satisfactory to Senior Lender) providing for the continued subordination of the Junior Debt as provided herein and for the continued effectiveness of all of the rights of Senior Lender arising under this Agreement. Notwithstanding the failure of any transferee to execute or deliver an agreement substantially the same as this Agreement (or otherwise satisfactory to Senior Lender), the subordination effected hereby shall survive the pledge, hypothecation, sale, assignment, conveyance or other transfer of all or any portion of the Junior Debt, and the terms of this Agreement shall be binding upon the successors and assigns of the Junior Debt as provided under this Agreement.

(b)    Senior Lender shall have the right to pledge, hypothecate, sell, assign, convey, or otherwise transfer all or any portion of the Senior Debt or any interest in the Senior Debt without the prior written consent of Junior Lender.

16.    **Construction and Interpretation of this Agreement**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without regard to the conflict of laws principles thereof, as to its interpretation, enforcement, validity,

construction, effect and in all other respects.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

17.    **Integration**.  This Agreement integrates all of the terms and conditions of the parties' agreement regarding the subjection and subordination of the Junior Loan Documents, together with all rights and privileges of Junior Lender thereunder, to the lien or charge of the Senior Loan Documents.  This Agreement supersedes and cancels all oral negotiations and prior and other writings with respect to such subjection and subordination (only to such extent, however, as would affect the priority between the Junior Loan Documents and the Senior Loan Documents).  This Agreement is intended by the parties as the final expression of the agreement, and as the complete and exclusive statement of the terms agreed to by the parties, with respect to such subordination and subjection, to the extent specified in the foregoing sentence.  If there is any conflict between the terms, covenants, conditions and provisions of this Agreement and those of the Junior Loan Documents or the Senior Loan Documents, the terms, covenants, conditions and provisions of this Agreement shall prevail.  This Agreement may not be modified orally or in any other manner, than by an agreement in writing signed by the parties hereto or their respective successors in interest.  Upon full payment of the Senior Debt, Senior Lender, will execute and deliver to Junior Lender upon request a release of this instrument (in recordable form, if this Agreement has been recorded).

18.    **Attorneys' Fees**.  If any lawsuit, reference, arbitration or, other proceeding is commenced which arises out of, or which relates to this Agreement, including any alleged tort action, the prevailing party shall be entitled to recover from each other party such sums as the court or other party presiding over such action or proceeding may adjudge to be reasonable attorneys' fees and costs in the action or proceeding, including the allocated costs for services of in-house counsel, in addition to costs and expenses otherwise allowed by law.  Any such attorneys' fees and costs incurred by any party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment and shall survive and not be merged into any such judgment.  The obligation to pay such attorneys' fees and costs is intended to be severable from the other provisions of this Agreement.

19.    **Further Assurances**.

(a)    Junior Lender shall execute such further documents or instruments and take such further action as Senior Lender may reasonably require from time to time to carry out the intent of this Agreement.

(b)    Senior Lender shall execute such further documents or instruments and take such further action as Junior Lender may reasonably require from time to time to carry out the intent of this Agreement.

20.    **Estoppel Certificates**.

(a)    <u>Senior Debt</u>.  Senior Lender hereby agrees that, within 10 business days after demand of Junior Lender, it shall execute and deliver a certification setting forth, to the best of Senior Lender's knowledge (1) the total outstanding balance of the Senior Debt, itemized to show the components thereof, (2) whether there are any material

defaults under the Senior Loan Documents (and if any do exist, provide a reasonable description thereof), (3) whether there are any material defaults under this Agreement (and if any do exist, provide a reasonable description thereof), and (4) that this Agreement remains in full force and effect, and any and all such certifications shall be conclusive as to the matters set forth therein, and shall be fully binding upon Senior Lender and its successors and assigns.

(b)     Junior Debt. Junior Lender hereby agrees that, within 10 business days after demand of Senior Lender, it shall execute and deliver a certification setting forth the to the best of Junior Lender's knowledge (1) the total outstanding balance of the Junior Debt, itemized to show the components thereof, (2) whether there are any material defaults under the Junior Loan Documents (and if any do exist, provide a reasonable description thereof), (3) whether there are any material defaults under this Agreement (and if any do exist, provide a reasonable description thereof), and (4) that this Agreement remains in full force and effect, and any and all such certifications shall be conclusive as to the matters set forth therein, and shall be fully binding upon Junior Lender and its successors and assigns.

21.     **No Third-Party Beneficiaries**.

(a)     Nothing in this Agreement is intended or shall be construed to confer upon or to give Borrower, or any other person or entity other than the parties hereto (and their successors and permitted assigns) any right, remedy or claim under or by reason of this Agreement. All terms and conditions in this Agreement shall be for the sole and exclusive benefit of the parties hereto and their successors and permitted assigns.

(b)     The provisions of this Agreement are and are intended to be solely for the purpose of defining the relative rights of the holder of the Junior Debt, on the one hand, and the holder of the Senior Debt, on the other hand. Nothing contained in this Agreement is intended to or shall impair, as between Borrower and its creditors other than the holder of the Senior Debt and the holder of the Junior Debt, the obligations of Borrower which are absolute and unconditional, to pay to the holder of the Junior Debt the principal thereof and interest thereon as and when the same shall become due and payable in accordance with its terms, or is intended to or shall affect the relative rights against Borrower of the holder of the Senior Debt.

22.     **No Waiver by Senior Lender**.

(a)     Senior Lender shall not be prejudiced in its rights under this Agreement by any act or failure to act by Borrower or Senior Lender, or any non-compliance of Borrower or Senior Lender with any agreement or obligation, regardless of any knowledge thereof which Senior Lender may have or with which Senior Lender may be charged; and no action of Senior Lender permitted hereunder shall in any way affect or impair the rights of Senior Lender and the obligations of the Junior Lender under this Agreement. No delay on the part of Senior Lender in the exercise of any rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Senior Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Agreement be binding upon Senior Lender except as expressly set forth in a writing duly signed and delivered on behalf of Senior Lender.

(b)     Junior Lender shall not be prejudiced in its rights under this Agreement by any act or failure to act by Borrower or Junior Lender, or any non-compliance of Borrower or Junior Lender with any agreement or obligation, regardless of any knowledge thereof which Junior Lender may have or with which Junior Lender may be charged; and no action of Junior Lender permitted hereunder shall in any way affect or impair the rights of Junior Lender and the obligations of Senior Lender under this Agreement.  No delay on the part of Junior Lender in the exercise of any rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Junior Lender of any right or remedy shall preclude other right or remedy; nor shall any modification or waiver of any of the provisions of this Agreement be binding upon Junior Lender except as expressly set forth in a writing duly signed and delivered on behalf of Junior Lender.

23.     **Advances**.  The proceeds of the Junior Loan will be fully disbursed as of the date of this Agreement.  Senior Lender, Junior Lender, and Borrower each hereby agreed that funds to be used in connection with the Property and for construction of the Improvements on the Land shall be advanced pursuant to the Budget and shall be distributed in the following order: (i) first, from the Initial Equity (as defined in the Senior Loan Agreement and as set forth in the Budget, which funds include the Junior Loan) until the maximum amount of the required Initial Equity has been spent, including without limitation the entire Junior Loan, then (ii) lastly from the Senior Lender, pursuant to and subject to the Senior Loan Documents, until the maximum amount of the Senior Loan have been advanced.

24.     **Prepayments**.  If Borrower has funds for prepayment, one hundred percent (100%) of such funds shall be distributed to Senior Lender towards payment of the Senior Loan, subject to and pursuant to the Senior Loan Documents, until such Senior Loan has been paid in full.

25.     **Application of Proceeds**.   Whether any Insolvency Proceeding has been commenced by or against Borrower, any Property or proceeds thereof received in connection with any exercise of rights or remedies shall (at such time as such Property or proceeds has been monetized) be applied: (a) first, to the payment in full in cash of costs and expenses of Senior Lender in connection with any exercise of rights and remedies, (b) second, to the payment in full in cash [or cash collateralization] of the Senior Secured Obligations in accordance with the Senior Loan Documents, (c) third, to the payment in full in cash of costs and expenses of Junior Lender in connection with any exercise of rights and remedies (to the extent Junior Lender's exercise of rights and remedies was permitted hereunder), and (d) fourth, to the payment in full in cash of the Junior Debt in accordance with the Junior Loan Documents.

26.     **Turnover; Subrogation**.

(a)     Unless and until the Senior Debt has been paid and satisfied in full, whether any Insolvency Proceeding has been commenced by or against Borrower, any payments, Property or proceeds thereof received by Junior Lender (i) in connection with the exercise of rights and remedies with respect to the Property by Junior Lender, or (ii) as a result of payments against the outstanding Junior Debt, unless Senior Lender provides its prior written consent, Junior Lender shall segregate and hold in trust and forthwith pay over to Senior Lender in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  Senior Lender is hereby authorized to make any such endorsements as agent for Junior Lender.

This authorization is coupled with an interest and is irrevocable until the Senior Debt has been paid and satisfied in full.

(b)      With respect to any payments or distributions in cash, property, or other assets that Junior Lender pays over to Senior Lender under the terms of this Agreement, Junior Lender shall be subrogated to the rights of Senior Lender; provided, however, that, Junior Lender hereby agrees not to assert or enforce any such rights of subrogation it may acquire as a result of any payment hereunder until the Senior Debt has been paid in full. Any payments or distributions in cash, property or other assets received by Junior Lender that are paid over to Senior Lender pursuant to this Agreement shall not reduce any of the outstanding Junior Debt.

27.    **Avoidance Issues**.  If Senior Lender is required in any Insolvency Proceeding or otherwise to turn over, disgorge or otherwise pay to the estate of Borrower or any other party any amount paid in respect of the Senior Debt (a "**Recovery**"), then Senior Lender shall be entitled to a reinstatement of the Senior Debt with respect to all such recovered amounts, and all rights, interests, priorities and privileges recognized in this Agreement shall apply with respect to any such Recovery.   If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereto from such date of reinstatement.

28.    **Amendments and Waivers**.  Neither this Agreement nor any terms hereof may be amended, modified or waived other than by a written agreement executed by the party against which such amendment, modification or waiver is sought to be enforced.

29.    **Counterparts; Electronic Signatures**.  This Agreement may be executed in 2 or more counterparts, each of which shall be deemed an original and all of which shall constitute 1 and the same instrument.   Delivery of an executed counterpart of a signature page of this Agreement by facsimile, portable document format (.pdf) or other electronic format shall be effective as delivery of a manually executed counterpart of this Agreement.

30.    **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Junior Lender and Senior Lender and their respective successors and assigns, including (i) as to Senior Lender, without limitation, any holder of the Senior Note that acquires rights in the Senior Note by the exercise of foreclosure or similar remedies against the Senior Note, or by any other assignment or transfer pursuant to Section 15 above, and (ii) as to Junior Lender, without limitation, any holder of the Junior Note that acquires rights in the Junior Note pursuant to Section 15 above.

[Signature Pages Follow.]

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties to be effective as of the day and year first above written.

**SENIOR LENDER:**

HALL CA-NV, LLC,
a Texas limited liability company

By: _____
Name: Michael J. Jaynes
Title: President

**INTERCREDITOR AGREEMENT** – Signature Page

**JUNIOR LENDER:**

LADERA DEVELOPMENT, LLC,
a Nevada limited liability company

By: _____
Name: _James Pickett_
Title: _Managing Member_

By: _____
Name: _____
Title: _____

**BORROWER:**

**NEW CAL-NEVA LODGE, LLC**
a Nevada limited liability company

By:   Cal-Neva Lodge, LLC
    a Nevada limited liability company
    its managing member

    By: _____
    Name: _____
    Title: _____


**GUARANTORS:**


_____
WILLIAM CRISWELL


_____
ROBERT RADOVAN


**INTERCREDITOR AGREEMENT** – Signature Page

**BORROWER:**

**NEW CAL-NEVA LODGE, LLC**
a Nevada limited liability company

By:            Cal-Neva Lodge, LLC
                 a Nevada limited liability company
                 its managing member

                 By: _____
                 Name: _____
                 Title: _____

**GUARANTORS:**

_William Criswell_
WILLIAM CRISWELL

_____
ROBERT RADOVAN

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

The land referred to is situated in the unincorporated area of the County of Placer, State of California, and is described as follows:

ALL THAT CERTAIN REAL PROPERTY SITUATE WITHIN A PORTION OF GOVERNMENT LOT 4 AND LOT 5 OF SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, MOUNT DIABLO MERIDIAN, COUNTY OF PLACER, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**PARCEL 1:**

LOT 5 IN BLOCK N, AS SHOWN ON THE MAP OF "LAKE VISTA SUBDIVISION", FILED NOVEMBER 26, 1926 IN BOOK D OF MAPS, PAGE 22, PLACER COUNTY RECORDS.

APN: 090-305-004-000

**PARCEL 2:**

LOTS 10, 11, AND 12 IN BLOCK K; LOTS 1 AND A PORTION OF 2 IN BLOCK L; LOTS 3, 4, 5, 6, 7, 8, 9, 10, AND 11 IN BLOCK M; LOTS 6, 7, 8, 11, AND 12 IN BLOCK N; ALONG WITH ALL OF SPUR LANE, A PORTION OF WAVE AVENUE, A PORTION OF WHITE CAP LANE, A PORTION OF STATE LINE ROAD, AND A PORTION OF PELICAN DRIVE, ALL AS SHOWN ON THE CERTAIN MAP ENTITLED LAKE VISTA SUBDIVISION, FILED IN THE OFFICE OF THE COUNTY RECORDER OF PLACER COUNTY, CALIFORNIA, ON NOVEMBER 26, 1926 IN BOOK D OF MAPS, PAGE 22, ALL IN PLACER COUNTY, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT 11 IN SAID BLOCK K; THENCE ALONG THE SOUTHERLY LINE OF SAID LOT 11 AND LOT 10 IN SAID BLOCK K, SOUTH 89°45'58" WEST, 132.61 FEET TO THE SOUTHWEST CORNER OF SAID LOT 10; THENCE ALONG THE WEST LINE OF SAID LOT 10 AND ITS NORTHERLY PROLONGATION, NORTH, 299.40 FEET TO THE SOUTHERLY LINE OF SAID LOT 2; THENCE ALONG SAID SOUTHERLY LINE, SOUTH 77°41'58" WEST, 23.21 FEET TO A POINT ON A LINE PARALLEL WITH THE WEST LINE OF SAID LOT 2 AND DISTANT EASTERLY 55.00 FEET, MEASURED AT RIGHT ANGLES FROM SAID WEST LINE, THENCE ALONG SAID PARALLEL LINE, NORTH 0°13'14" EAST, 105.41 FEET TO A POINT ON THE SOUTHERLY LINE OF SAID WHITE CAP LANE, THENCE ALONG SAID SOUTHERLY LINE, NORTH 75°49'08" WEST, 15.78 FEET; THENCE NORTH 00°04'57" EAST, 40.87 FEET TO THE NORTHERLY LINE OF SAID WHITE CAP LANE; THENCE ALONG SAID NORTHERLY LINE, NORTH 76°39'25" WEST, 99.15 FEET; THENCE CONTINUING ALONG SAID NORTHERLY LINE OF SAID WHITE CAP LANE, NORTH 50°24'19" WEST, 65.60 FEET TO THE SOUTHWEST CORNER OF SAID LOT 3; THENCE ALONG THE WEST LINE OF SAID LOT 3, NORTH 00°12'31" EAST, 219.17 FEET TO THE SOUTHERLY LINE OF SAID PELICAN DRIVE; THENCE ALONG SAID SOUTHERLY LINE, SOUTH 75°58'00" EAST, 151.34 FEET; THENCE CONTINUING ALONG SAID SOUTHERLY LINE, EAST, 7.42 FEET TO A POINT ON THE SOUTHERLY PROLONGATION OF SAID WESTERLY LINE OF SAID LOT 12 IN

SAID BLOCK N; THENCE ALONG SAID SOUTHERLY PROLONGATION AND SAID WESTERLY LINE, NORTH 00°02'11" EAST, 189.84 FEET TO THE NORTHWEST CORNER OF SAID LOT 12 AND SAID CORNER ALSO BEING THE SOUTHEAST CORNER OF SAID LOT 6 IN SAID BLOCK N; THENCE ALONG THE SOUTH LINE OF SAID LOT 6, SOUTH 89°56'45" WEST, 50.03 FEET; THENCE ALONG THE WEST LINE OF SAID LOT 6 IN SAID BLOCK N, NORTH 00°00'31" WEST, 149.95 FEET TO THE NORTHWEST CORNER OF SAID LOT 6 IN SAID BLOCK N; THENCE EASTERLY ALONG THE NORTHERLY LINE OF SAID LOTS 6, 7, AND 8 IN SAID BLOCK N, NORTH 89°56'45" EAST, 150.21 FEET TO THE NORTHEAST CORNER OF SAID LOT 8; THENCE ALONG THE EAST LINE OF SAID LOT 8 AND 11 OF SAID BLOCK N AND THEIR SOUTHERLY PROLONGATION, SOUTH 00°02'35" WEST, 319.91 FEET TO THE CENTERLINE OF SAID PELICAN DRIVE, 40.00 FEET WIDE; THENCE ALONG SAID CENTERLINE, SOUTH 89°59'15" EAST, 49.90 FEET TO A POINT ON THE WEST LINE OF STATE LINE AVENUE, 20 FEET WIDE AS SHOWN ON SAID MAP; THENCE ALONG THE WEST LINE OF SAID STATE LINE AVENUE, SOUTH 00°30'00" WEST, 19.97 FEET TO THE NORTHEAST CORNER OF LOT 7 OF SAID BLOCK M; THENCE ALONG THE EASTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID LOT 7, SOUTH 89°54'44" EAST, 14.33 FEET TO A POINT ON THE CALIFORNIA - NEVADA BOUNDARY LINE, SAID BOUNDARY LINE ALSO BEING THE EAST LINE OF SAID LAKE VISTA SUBDIVISION; THENCE ALONG SAID BOUNDARY LINE AND SAID EAST LINE, SOUTH 00°10'00" WEST, 691.19 FEET TO THE POINT OF BEGINNING.

APN: 090-350-015 & 090-315-022

BEING THE SAME LAND DESCRIBED IN THE GRANT DEED RECORDED JUNE 16, 2014, AS DOCUMENT NO. 2014-0039754, AND AS DEPICTED ON THAT RECORD OF SURVEY #3308, DATED MARCH 18, 2014, FILED MARCH 24, 2014, IN BOOK 22 OF SURVEYS, PAGE 79, PLACER COUNTY RECORDS.

ALL THAT CERTAIN REAL PROPERTY SITUATE WITHIN A PORTION OF SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, MOUNT DIABLO MERIDIAN, COUNTY OF WASHOE, STATE OF NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL 1 (NV):

BEGINNING AT A POINT ON THE WEST LINE OF SOMERS DRIVE, 100 FEET SOUTH OF THE INTERSECTION OF THE WEST LINE OF SAID SOMERS DRIVE WITH THE SOUTH LINE OF CRYSTAL DRIVE, AS SHOWN ON THE MAP OF ADDITION TO NEVADA VISTA SUBDIVISION, SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., LAKE TAHOE, STATE OF NEVADA, COUNTY OF WASHOE, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON FEBRUARY 15, 1928; THENCE NORTH 89°54'44" WEST, A DISTANCE OF 464.50 FEET, MORE OR LESS, TO THE CALIFORNIA-NEVADA STATE LINE; THENCE SOUTH 0°10'00 WEST, 591.19 FEET, ALONG THE SAID STATE LINE TO ITS INTERSECTION WITH THE LAND HERETOFORE CONVEYED TO FRANK H. BUCK AND WIFE, BY DEED RECORDED IN BOOK 62, PAGE 8, DEED RECORDS OF WASHOE COUNTY, NEVADA; THENCE NORTH 89°45'58" EAST, 1.46 FEET ALONG THE NORTHERLY LINE OF SAID BUCK LAND; THENCE SOUTH 59°07'54" EAST, 140.82 FEET ALONG THE NORTHERLY LINE OF SAID BUCK LAND TO AN INTERSECTION WITH THE NORTHWESTERLY LINE OF A PARCEL OF LAND HERETOFORE CONVEYED TO BROCKWAY TAHOE VISTA CORPORATION, BY DEED RECORDED IN BOOK 74, PAGE 348, DEED RECORDS OF WASHOE COUNTY, NEVADA; THENCE NORTH 54°09'58" EAST, ALONG THE NORTHWESTERLY LINE OF SAID BROCKWAY TAHOE VISTA CORPORATION PARCEL, A DISTANCE OF 389.79 FEET, MORE OR LESS, TO THE NORTHWESTERLY CORNER OF LOT 6 IN BLOCK C OF NEVADA VISTA SUBDIVISION,  BEING A SUBDIVISION OF PORTION OF LOTS 1 AND 2 AND I AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA ON AUGUST 26, 1926; THENCE NORTH 35°50'41' WEST, A DISTANCE OF 50.00 FEET; THENCE NORTH 54°11'51" EAST, A DISTANCE OF 105.47 FEET TO THE WESTERLY LINE OF SOMERS DRIVE; THENCE NORTHWESTERLY ALONG THE WESTERLY LINE OF SOMERS DRIVE, NORTH 35°52'32' WEST, A DISTANCE OF 49.79 FEET; THENCE NORTHERLY ALONG THE WESTERLY LINE OF SOMERS DRIVE, NORTH 00°09'17' EAST, A DISTANCE OF 291.95 FEET TO THE POINT OF BEGINNING.
APN: PORTION OF 123-031-01

PARCEL 2 (NV):

BEGINNING AT A POINT ON THE SOUTH SIDE OF CRYSTAL DRIVE FROM WHICH THE NORTHWEST CORNER OF LOT 20 IN BLOCK B OF NEVADA VISTA SUBDIVISION, BEING A PORTION OF LOTS 1, AND 2, AND I, AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP OF

**INTERCREDITOR AGREEMENT** – Exhibit A

THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON AUGUST 26, 1926, BEARS SOUTH 89°54'44" EAST, 376.67 FEET; THENCE SOUTH 0°39'18" WEST, 100.00 FEET; THENCE NORTH 89°54'44" WEST, 100.46 FEET TO THE EAST LINE OF STATE LINE ROAD; THENCE ALONG SAID STATE LINE ROAD, NORTH 0°55'07 EAST, 100.00 FEET; THENCE SOUTH 89°54'44" EAST, 100.00 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ANY PORTION OF THE ABOVE DESCRIBED PROPERTY LYING WESTERLY OF THE EAST LINE OF STATELINE ROAD AS SET FORTH ON THE NEVADA VISTA SUBDIVISION MAP RECORDED FEBRUARY 15, 1928 AS TRACT MAP NO. 214.

PARCEL 3 (NV):

COMMENCING AT THE INTERSECTION OF THE SOUTHERLY LINE OF CRYSTAL DRIVE WITH THE WESTERLY LINE OF SOMERS DRIVE, AS SHOWN ON THE MAP OF ADDITION TO NEVADA VISTA SUBDIVISION, SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., LAKE TAHOE, STATE OF NEVADA, COUNTY OF WASHOE, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON FEBRUARY 15, 1928; THENCE WESTERLY ALONG THE SOUTHERLY LINE OF CRYSTAL DRIVE, NORTH 89°54'44" WEST, A DISTANCE OF 124.20 FEET TO THE TRUE POINT OF BEGINNING FOR THE DESCRIPTION OF THIS PARCEL; THENCE WESTERLY ALONG THE SOUTHERLY LINE OF CRYSTAL DRIVE, NORTH 89°54'44" WEST, A DISTANCE OF 162.47 FEET; THENCE SOUTHERLY, SOUTH 00°31'24" WEST, A DISTANCE OF 100.00 FEET; THENCE EASTERLY, SOUTH 89°54'44" EAST, A DISTANCE OF 163.21 FEET; THENCE NORTHERLY, NORTH 00°05'57" EAST, 100.00 FEET TO THE TRUE POINT OF BEGINNING.

APN: PORTION OF 123-031-01

PARCEL 4A (NV):

BEGINNING AT A POINT FROM WHICH THE MOST WESTERLY CORNER OF LOT 6 IN BLOCK C OF NEVADA VISTA SUBDIVISION, BEING A SUBDIVISION OF PORTION OF LOTS 1 AND 2 AND I AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON AUGUST 26, 1926, BEARS NORTH 54°09'58" EAST, 200.13 FEET; THENCE NORTH 54°09'58" EAST, 40.03 FEET; THENCE SOUTH 35°46'37" EAST, 158.38 FEET TO THE NORTH LINE OF SOMERS DRIVE; THENCE ALONG SOMERS DRIVE SOUTH 54°10'38" WEST, 40.07 FEET; THENCE NORTH 35°45'40" WEST, 158.37 FEET TO THE POINT OF BEGINNING.

APN: PORTION OF 123-031-01

**INTERCREDITOR AGREEMENT – Exhibit A**

PARCEL 4B (NV):

BEGINNING AT A POINT FROM WHICH THE MOST WESTERLY CORNER OF LOT 6 IN
BLOCK C OF NEVADA VISTA SUBDIVISION, BEING A SUBDIVISION OF PORTION OF LOTS 1
AND 2 AND I AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M.,
STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP THEREOF, FILED IN
THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON
AUGUST 26, 1926, BEARS NORTH 54°09'58" EAST, 200.13 FEET; THENCE SOUTH 35°45'40"
EAST, 158.37 FEET TO THE NORTH LINE OF SOMERS DRIVE; THENCE ALONG SOMERS
DRIVE, SOUTH 54°10'38" WEST, 7.96 FEET; THENCE ALONG SOMERS DRIVE SOUTH
39°53'24" WEST, 33.07 FEET; THENCE NORTH 35°46'13" WEST, 166.53 FEET; THENCE NORTH
54°09'58" EAST, 40.03 FEET TO THE POINT OF BEGINNING

APN: PORTION OF 123-031-01

PARCEL 4C (NV):

BEGINNING AT A POINT FROM WHICH THE MOST WESTERLY CORNER OF LOT 6 IN
BLOCK C OF NEVADA VISTA SUBDIVISION, BEING A SUBDIVISION OF PORTION OF LOTS
1, AND 2, AND I, AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M.,
STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP THEREOF, FILED IN
THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON
AUGUST 26, 1926, BEARS NORTH 54°09'58" EAST, 280.19 FEET; THENCE NORTH 54°09'58"
EAST, 40.03 FEET; THENCE SOUTH 35°46'13" EAST, 166.53 FEET TO THE NORTH LINE OF
SOMERS DRIVE; THENCE ALONG SOMERS DRIVE, SOUTH 39°53'24" WEST, 41.28 FEET;
THENCE NORTH 35°46'50" WEST, 176.70 FEET TO THE POINT OF BEGINNING.

APN: PORTION OF 123-031-01

PARCEL 4D (NV):

BEGINNING AT A POINT FROM WHICH THE MOST WESTERLY CORNER OF LOT 6 IN
BLOCK C OF NEVADA VISTA SUBDIVISION, BEING A SUBDIVISION OF PORTION OF LOTS
1, AND 2, AND I, AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M.,
STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP THEREOF, FILED IN
THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON
AUGUST 26, 1926, BEARS NORTH 54°09'58" EAST, 280.19 FEET; THENCE SOUTH 35°46'50"
EAST, 176.70 FEET TO THE NORTH LINE OF SOMERS DRIVE; THENCE ALONG SOMERS
DRIVE, SOUTH 39°53'24" WEST, 31.02 FEET; THENCE ALONG BUCK PROPERTY NORTH
59°07'54" WEST, 200.72 FEET, MORE OR LESS, TO THE SOUTHERLY LINE OF THE LAND

CONVEYED TO CAL-NEVA, INC., A NEVADA CORPORATION, BY DEED RECORDED IN BOOK 79, PAGE 3, DEED RECORDS OF WASHOE COUNTY, NEVADA; THENCE NORTH 54°09'58" EAST, 109.61 FEET TO THE POINT OF BEGINNING.

APN: PORTION OF 123-031-01

PARCEL 5 (NV):

BEGINNING AT THE INTERSECTION OF THE WESTERN LINE OF SOMERS DRIVE WITH THE SOUTHERN LINE OF CRYSTAL DRIVE, AS SAID CRYSTAL DRIVE IS SHOWN ON THE MAP OF ADDITION TO NEVADA VISTA SUBDIVISION, SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., LAKE TAHOE, STATE OF NEVADA, COUNTY OF WASHOE, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON FEBRUARY 15, 1928; THENCE ALONG SAID WESTERN LINE OF SOMERS DRIVE, SOUTH 0°41'17" EAST, 50.00 FEET; THENCE NORTH 89°54'44" WEST, 124.89 FEET; THENCE NORTH 0°05'57" EAST, 50.00 FEET TO SAID SOUTHERN LINE OF CRYSTAL DRIVE; THENCE ALONG SAID SOUTHERLY LINE OF CRYSTAL DRIVE, SOUTH 89°54'44" EAST, 124.20 FEET TO THE POINT OF BEGINNING
APN: PORTION OF 123-031-01

PARCEL 6 (NV):

COMMENCING AT THE INTERSECTION OF THE WESTERN LINE OF SOMERS DRIVE WITH THE SOUTHERN LINE OF CRYSTAL DRIVE, AS SAID CRYSTAL DRIVE IS SHOWN ON THE MAP OF ADDITION TO NEVADA VISTA SUBDIVISION, SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., LAKE TAHOE, STATE OF NEVADA, COUNTY OF WASHOE, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON FEBRUARY 15, 1928. THENCE SOUTH 0°41'17" EAST, ALONG SAID WESTERN LINE OF SOMERS DRIVE, A DISTANCE OF 50.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 0°41'17" EAST, ALONG THE WESTERLY LINE OF SOMERS DRIVE, A DISTANCE OF 50.00 FEET; THENCE NORTH 89°54'44" WEST, A DISTANCE OF 125.57 FEET; THENCE NORTH 0°05'57" EAST, A DISTANCE OF 50.00 FEET; THENCE SOUTH 89°54'44" EAST, A DISTANCE OF 124.89 FEET TO THE TRUE POINT OF BEGINNING.

APN: PORTION 123-031-01

PARCEL 7 (NV):

BEGINNING AT A POINT ON THE SOUTH SIDE OF CRYSTAL DRIVE FROM WHICH THE NORTHWEST CORNER OF LOT 20 IN BLOCK B OF NEVADA VISTA SUBDIVISION, BEING A SUBDIVISION OF PORTION OF LOTS 1 AND 2 AND I AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON AUGUST 26, 1926, BEARS SOUTH 89°54'44"

**INTERCREDITOR AGREEMENT** – Exhibit A

EAST, 336.67 FEET; THENCE SOUTH 0°31'24" WEST, 100.00 FEET; THENCE NORTH 89°54'44" WEST, 50.23 FEET; THENCE NORTH 0°39'18" EAST, 100.00 FEET; THENCE SOUTH 89°54'44" EAST, 50.00 FEET TO THE POINT OF BEGINNING.

APN: PORTION OF 123-031-01

PARCEL 8 (NV):

BEGINNING AT THE MOST WESTERLY CORNER OF LOT 6, IN BLOCK C OF NEVADA VISTA SUBDIVISION, BEING A SUBDIVISION OF PORTION OF LOTS 1, AND 2, AND I, AND II IN SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., STATE OF NEVADA, COUNTY OF WASHOE, ACCORDING TO THE MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON AUGUST 26, 1926; THENCE SOUTH 35°50'41" EAST, ALONG THE SOUTHWESTERLY LINE OF SAID LOT 6, A DISTANCE OF 158.41 FEET TO THE NORTHWEST LINE OF SOMERS DRIVE, AS SHOWN ON SAID MAP; THENCE SOUTH 54°10'38" WEST, ALONG THE NORTHWESTERLY LINE OF SAID SOMERS DRIVE, 160.29 FEET TO A POINT; THENCE NORTH 35°46'37" WEST, 158.38 FEET TO A POINT; THENCE NORTH 54°09'58" EAST, 160.10 FEET TO THE POINT OF BEGINNING.

APN: PORTION OF 123-031-01

PARCEL 9 (NV):

LOT 16A, LOT 16 AND THE SOUTH 31.6 FEET OF LOT 15, AND THE SOUTH 131.6 FEET OF LOT 14 IN BLOCK A OF ADDITION TO NEVADA VISTA SUBDIVISION, SECTION 30, TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., LAKE TAHOE, STATE OF NEVADA, COUNTY OF WASHOE COUNTY, STATE OF NEVADA ON FEBRUARY 15, 1928.

EXCEPTING THEREFROM THAT PARCEL CONVEYED TO WASHOE COUNTY SEWER IMPROVEMENT DISTRICT NO. 1, BY DEED DATED OCTOBER 19, 1977, RECORDED JANUARY 12, 1978 UNDER FILING NO. 508380, OFFICIAL RECORDS.

APN: 123-044-06

PARCEL 10 (NV):

THAT PORTION OF SECTION 30 TOWNSHIP 16 NORTH, RANGE 18 EAST, M.D.B.&M., SET FORTH IN THAT CERTAIN DOCUMENT ENTITLED DECREE QUIETING TITLE CASE NO. CV05-02646 RECORDED MAY 22, 2006 AS DOCUMENT NO. 3390724 IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, DESCRIBED AS FOLLOWS:

THAT 20 FOOT BY 100 FOOT VERTICAL STRIP BOUNDED ON THE NORTH AT THE
SOUTHERLY LINE OF CRYSTAL DRIVE AND BOUNDED ON THE WEST BY THE
CALIFORNIA-NEVADA STATELINE, FORMERLY KNOWN AS STATELINE ROAD.

APN: 123-031-09

BASIS OF BEARINGS FOR THIS DESCRIPTION IS IDENTICAL TO THE B.L.M. PLAT OF
"RETRACTMENT, DEPENDENT RESURVEY, AND SUBDIVISION" OF THE CALIFORNIA -
NEVADA STATE LINE FROM MILEPOST 186 TO MILEPOST 191. ACCEPTED PLAT DATE OF
MARCH 9, 1993.

REFERENCE IS MADE TO RECORD OF SURVEY MAP NO. 5552, RECORDED MARCH 6, 2014
AS FILE NO. 4332285, OFFICIAL RECORDS, WASHOE COUNTY, NEVADA

NOTE:  The above metes and bounds description appeared previously in that certain document recorded
in the office of the County Recorder of Washoe County, Nevada on June 13, 2014, as Document No.
4363424 of Official Records.

**EXHIBIT B**

**DESCRIPTION OF SENIOR LOAN DOCUMENTS**

1.      Construction Loan Agreement;

2.      Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents and Leases (California);

3.      Construction Deed of Trust; Security Agreement and Fixture Filing with Assignment of Rents and Leases (Nevada);

4.      Promissory Note;

5.      Hazardous Materials Indemnity Agreement;

6.      Hazardous Materials Indemnity Agreement (Beach House);

7.      Guaranty Agreement (William Criswell);

8.      Guaranty Agreement (Robert Radovan);

9.      Pledge and Security Agreement;

10.     Assignment of Licenses, Permits and Contracts;

11.     Notice of Invalidity of Oral Agreements;

12.     Deposit Account Control Agreement;

13.     Closing Certificate;

14.     Assignment of Construction Documents;

15.     Contractor's Agreement and Consent to Assignment of Construction Documents;

16.     Architect's Agreement and Consent to Assignment of Construction Documents (Craig Roberts Associates, Inc.);

17.     Architect's Agreement and Consent to Assignment of Construction Documents (Collaborative Design Studio);

18.     Engineer's Agreement and Consent to Assignment of Construction Documents;

19.     Subordination Agreement (General Contractor);

20.     Subordination Agreement (Subcontractor);

21.     Assignment and Subordination of Management Agreement;

22.     Subordination of Development Agreement;

23.     Assignment of Development Agreement;

24.     Assignment, Subordination and Attornment Agreement;

25.     Deposit Account Control Agreement (Gaming Operations);

26.     UCC-1 Financing Statement to be filed in Nevada Secretary of State for Borrower;

27.     UCC-1 Financing Statement to be filed in Placer County, California;

28.     UCC-1 Financing Statement in Washoe County, Nevada;

29.     UCC-1 Financing Statement to be filed in Nevada Secretary of State for Pledge Agreement;

30.     Post-Closing Agreement; and

31.     Joinder Agreement.

## EXHIBIT C

## DESCRIPTION OF JUNIOR LOAN DOCUMENTS

1.      Promissory Note secured by Deed of Trust;

2.      Loan Agreement;

3.      Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing for recordation in Placer County, California (the "**California Deed of Trust**");

4.      Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing for recordation in Washoe County, Nevada (the "**Nevada Deed of Trust**");

5.      Guaranty of Recourse Obligations;

6.      Hazardous Substances Indemnity Agreement;

7.      Pledge Agreement;

8.      Assignment of Pledged Membership Interest;

9.      UCC-1 Financing Statement filed in Washoe County, Nevada, as a fixture filing;

10.     UCC-1 Financing Statement filed with Nevada Secretary of State, with regard to pledge of membership interests in Borrower; and

11.     UCC-1 Financing Statement filed with Nevada Secretary of State, with respect to personal property and Property which does not constitute fixtures.

INTERCREDITOR AGREEMENT – Exhibit D

EXHIBIT D
BUDGET

**Detailed Funding Schedule**
**Cal-Neva**

| | Original Development Budget | Budget Revisions/ Chg Orders | Adjustments | Revised Development Budget |
|---|---|---|---|---|
| **Sources of Cash** | | | | |
| Hall's 1st Lien | $29,000,000 | | | 29,000,000 |
| Borrower Equity | $19,877,500 | 0 | 0 | 21,789,433 |
| Total Sources of Cash | $48,877,500 | 0 | 0 | 50,789,433 |
| | | | | |
| **Uses of Cash** | | | | |
| **Hard Cost & FF&E** | | | | |
| Acquisition Cost | $16,650,000 | | | 16,650,000 |
| GC Contract( 30001,32001, 32003, 32006) | $14,500,000 | 3,110,332 | | 17,610,332 |
| FF&E (4000) | $5,750,000 | (1,059,000) | | 4,691,000 |
| Total Construction & Related | $36,900,000 | $2,051,332 | 0 | 38,951,332 |
| | | | | |
| **Soft & Other Costs** | | | | |
| Architect & Engineering (Design 2) | $1,550,000 | | | 1,550,000 |
| Consultant/Legal Fees (70202, 70201) | $250,000 | 267,351 | | 517,351 |
| Permits/Utility Tap (10201, 10303) | $100,000 | | | 100,000 |
| Construction Mgmt./Developer Fee | $1,200,000 | | | 1,200,000 |
| Insurance | $150,000 | (100,000) | 0 | 50,000 |
| Property Tax | $300,000 | | | 300,000 |
| OS&E | $1,875,000 | (306,750) | | 1,568,250 |
| Pre-Opening | $1,350,000 | | | 1,350,000 |
| Working Capital | $200,000 | | | 200,000 |
| Other | $650,000 | | | 650,000 |
| Contingency | $1,500,000 | | | 1,500,000 |
| Total Soft Costs | $9,125,000 | ($139,399) | 0 | 8,985,601 |
| | | | | |
| **Financing Costs** | | | | |
| Lender's Origination Fee | $580,000 | 0 | | 580,000 |
| Mortgage Banking Fee | $290,000 | 0 | | 290,000 |
| Closing/Other Costs | $25,000 | | | 25,000 |
| Interest Reserve | $1,957,500 | | 0 | 1,957,500 |
| Total Financing Costs | $2,852,500 | | $0 | 2,852,500 |
| | | | | |
| Total Uses of Cash | $48,877,500 | | 0 | 50,789,433 |