# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

HALL CA-NV, LLC, a Texas limited liability company,

               Plaintiff,

       vs.

LADERA DEVELOPMENT, LLC, a Nevada limited liability company,

               Defendant.

3:18-cv-00124-RCJ-CBC

**ORDER**

Before this Court is Plaintiff's Motion for Partial Summary Judgment (ECF No. 139).[1] This motion is fully briefed. (ECF Nos. 145, 153.) After review of all the parties' briefs and exhibits, the Court grants this motion in part and denies it in part.[2]

///

///

---

[1] Plaintiff does not categorize this motion as one for "partial" summary judgment; however, Plaintiff only seeks summary judgment on the liability portion of the claims and counterclaims. In its reply, Plaintiff indicates that it will seek a "prove-up evidentiary hearing" for damages. (*See* ECF No. 153 at 18.)

[2] The parties have also filed a number of extraneous motions, which this Court rules upon quickly. Plaintiff and Defendant both sought additional time in filing their reply and response respectively, and Defendant sought leave to file additional pages in its response. The Court grants these motions given the extensive factual background of this case spanning nearly a decade.

# FACTUAL BACKGROUND

New Cal-Neva Lodge, LLC ("Borrower") previously owned a certain property on the border of Nevada and California located in Crystal Bay, Washoe County, Nevada and in Placer County, California (the "Property"). Borrower acquired the Land in February 2013 and operated a resort hotel on it known as the Cal-Neva Lodge.

On June 26, 2013, Borrower and Plaintiff Hall CA-NV, LLC ("Plaintiff Hall") entered into a letter of engagement by which Plaintiff Hall tentatively agreed to provide Borrower with a loan for $29,000,000 "to pay expenditures related to the renovation of improvements on the Property." (ECF No. 53 Ex. 2 ("June 26 Letter").) Per the letter, final approval of the loan would be based upon certain conditions being met such as a renovation plan approved by Plaintiff Hall. (*Id.*)

Over the next fifteen months, Plaintiff Hall and Borrower negotiated the terms of the loan, reviewed construction plans, and made modifications before the loan closed on September 30, 2014. (*See* ECF No. 139 Ex. 1 ("Construction Loan Agreement").) Under this agreement, Plaintiff Hall would loan the money out over time with monthly installments as needed. (*Id.* § 12.)

During the negotiation period, the parties also discussed with Defendant Ladera Development LLC ("Defendant Ladera") about acquiring additional funds to ensure there would be sufficient moneys to complete the construction project. Borrower agreed with Defendant Ladera Development LLC ("Defendant Ladera") that Defendant Ladera would contribute a $6,000,000 mezzanine loan[3] to Borrower for the construction project, which also closed on September 30, 2014. (ECF No. 139 Ex. 3 ("Junior Loan Agreement").)[4] Defendant Ladera indicated that the loan was

---

[3] A "mezzanine loan" is "a form of lending to businesses in which a company that is borrowing pays a higher rate of interest than on other loans but has longer to pay back the debt, which may also be changed into shares in the company." Cambridge Dictionary, "mezzanine finance," (https://dictionary.cambridge.org/us/dictionary/english/mezzanine-finance).

[4] Defendant Ladera was chosen, in part, because it had previously made a $5,000,000 bridge loan to Borrower a few months prior to the closing of the loans at issue in this case.

worth the risk involved if it were to be second only to Plaintiff Hall's loan, which Plaintiff Hall

acknowledged in an internal memorandum dated September 15, 2014. (ECF No. 145 Ex. 11 ("Hall

Memo") at 2 ("Ladera is requiring a 2nd lien secured by the property, and a pledge of the Borrower

partnership interest.").)

Before the September 30, 2014 closing date, Plaintiff Hall and Defendant Ladera entered

into a separate agreement, whereby Plaintiff Hall's loan would be senior to Defendant Ladera's

loan. (ECF No. 139 Ex. 4 ("Intercreditor Agreement").) Relevant to this case, the Intercreditor

agreement imposed a number of duties onto Defendant Ladera:

1. "Junior Lender shall not in any manner interfere with Senior Lender's security interests in the Property unless and until all of the Senior Debt is no longer outstanding." (*Id.* at 4.)
2. "Junior Lender agrees that it will not at any time contest the validity, perfection, priority or enforceability of any of the Senior Debt, any of the Senior Loan Documents, or any of the liens and security interests of Senior Lender in the Property or other collateral securing the Senior Debt." (*Id.* at 5.)
3. "[Junior Lender will] not take any action or vote in any way so as to (A) contest the legality, validity or enforceability of this Agreement or any Senior Loan Document . . . ." (*Id.* at 11.)
4. "Notwithstanding anything to the contrary contained in this Agreement, during the continuance of any Insolvency Proceeding, the Senior Debt shall first be indefeasibly paid and satisfied in full in cash before any payment or distribution of cash or other property is made upon the Junior Debt. In any Insolvency Proceeding, any payment or distribution which may be payable or deliverable with respect to the Junior Debt shall be paid or delivered directly to Senior Lender for application to the payment and satisfaction of the Senior Debt unless and until the Senior Debt shall have been indefeasibly paid and satisfied in full in cash." (*Id.* at 10.)
5. "If applicable, Junior Lender agrees to vote for any plan of reorganization approved by Senior Lender in respect of Borrower in any Insolvency Proceeding respecting Borrower; provided, however, that Senior Lender agrees not to unreasonably withhold or delay its consent to Junior Lender's voting for a different plan of reorganization if (i) the different plan is at least as beneficial to Senior Lender (including without limitation with respect to Senior Lender's payment, lien and remedy rights thereunder) as the plan approved by Senior Lender, and (ii) Junior Lender agrees in writing (A) that any payments received by Junior Lender by virtue of such Insolvency Proceeding will be held by Junior Lender in trust for the benefit of Senior Lender until such time as the Senior Debt is satisfied in full, and (B) if the Senior Debt will not be satisfied in full by virtue of such Insolvency Proceeding, promptly pay over to Senior Lender the payments so held in trust up to the amount of the deficiency." (*Id.*)
6. "Junior Lender agrees not to oppose any post-petition motion filed or supported by Senior Lender, including, without limitation, motions for adequate protection with respect to the

Senior Debt, for relief from stay, or for Borrower's application of cash collateral for use in the ordinary course of its business or for postpetition borrowing from Senior Lender." (*Id.* at 12.)

7. "Junior Lender shall release insurance proceeds and condemnation awards, to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Loan Documents, in the same manner as Senior Lender, under, the terms and provisions of the Senior Loan Documents, so that no conflicts are created by and among Senior Lender, Junior Lender, or others in the application of insurance proceeds or condemnation awards. Senior Lender has the sole and exclusive right, as against Junior Lender, to adjust settlement of insurance claims under the insurance policies in the event of any covered loss or destruction. All proceeds of such insurance related to the Property shall inure to the Senior Lender, and Junior Lender shall cooperate (if necessary) in a reasonable manner in effecting the payment of such insurance proceeds to Senior Lender. In the event Senior Lender permits the Borrower to utilize the proceeds of insurance to replace any part of the Property, the consent of Senior Lender shall be deemed to include the consent of Junior Lender." (*Id.* at 5.).

To protect their respective interests in the Property, both Plaintiff Hall and Defendant Ladera acquired title insurance policies. Plaintiff Hall purchased a title insurance policy from Old Republic National Title Insurance Company ("Old Republic"), which failed to cover any superior mechanics' lien arising from Penta's prior work on the Property. (ECF No. 145 Ex. 22 ("Hall Insurance Policy") at LAD006948, LAD006973 (omitting standard coverage for "[t]he lack of priority of the lien of the Insured Mortgage upon the Title . . . as security for each and every advance of proceeds of the loan secured by Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the land when the improvement or work . . . .") Defendant Ladera also purchased title insurance from Old Republic. (ECF No. 145 Ex. 23 ("Ladera Insurance Policy").) Unlike Hall's Insurance Policy, Ladera's insurance policy did cover mechanics' liens. (*Id.*)

Defendant Ladera hired a law firm, Hopkins Carley, a law corporation. Defendant Ladera hired these attorneys to review the Intercreditor Agreement prior to entering the mezzanine loan to make sure it was enforceable, acceptable to Ladera, and to explain the terms to him, as well as

///

to review the loan documents between Hall and the Borrower, and Hall and Penta. (ECF No. 139 Ex. 5 ("Jeffrey Pickett Depo") at 86:11–87:25.)

Before the parties closed the loans in September 2014, some construction work was performed on the Property from fall 2013 to January 2014. This work included the following: work on a model room, repair the roof, replace the boiler, remove trees, and abatement work for asbestos. (ECF No. 145 Ex. 5 ("Jaynes Depo") at 89:2–22.) To complete this work, Borrower hired the PENTA Building Group ("Penta"). Plaintiff Hall's 30(b)(6) witness, Michael Jaynes, admits that he was aware of this construction work as early as late 2013. (*Id.* at 63:8–11.)

Under Nevada Revised Statutes Chapter 108, contractors generally enjoy a lien on properties on which they have performed work. Nev. Rev. Stat. § 108.225. These liens are prior to subsequent deeds of trust and mortgages. Nev. Rev. Stat. §§ 108.2453, 108.2457. As such, Penta arguably had a first-in-line lien on the Property over and above the deeds of trust for Plaintiff Hall and Defendant Ladera.

Between the 2013 work and the closing of the loans, there were several representations from Plaintiff Hall and Penta that at least appeared to posit that Penta had not performed any work on the Property before the closing of the loans. First, there was a document titled "Contractor's Agreement and Consent to Assignment of Construction Documents," which was signed by Penta and Plaintiff Hall and dated September 29, 2014. (ECF No. 145 Ex. 17 ("Contractor's Agreement").) This document states:

> Under the Agreement, no work of any kind (including the destruction or removal of any existing improvements, site work, clearing, grubbing, draining, or fencing) has been commenced or performed on the property described in the Agreement and no equipment, or materials have been delivered to the property described in the agreement for any purpose whatsoever.

///

///

1  (*Id.* at 1.)[5] The Contractor's Agreement defines the term "Agreement" collectively to include "any

2  other agreements executed by [Penta] and [Borrower] in connection with the [Property]." (*Id.*)

3      Second, on the deeds of trust providing Defendant Ladera with a lien on the Property, De-

4  fendant Ladera is listed as having a "second priority lien." (ECF No. 145 Ex. 13 ("Deeds of Trust")

5  at 1.) This is in spite of the fact that Penta arguably had the first-in-line lien, making Plaintiff Hall

6  the second-in-line lien and Defendant Ladera the third-in-line lien.

7      Third, in the Junior Loan Agreement,[6] a number of places indicate that Defendant Ladera

8  will be granted "a second priority lien on the" Property. (Junior Loan Agreement at 2.) Under an

9  article titled "CONDITIONS PRECEDENT TO LENDING," Defendant Ladera's lien "must be

10 duly perfected and in a second priority lien position subject only to the deed of trust securing"

11 Plaintiff's Hall's lien. (*Id.* at 6.)

12     Fourth, the Intercreditor Agreement states that Defendant Ladera's "Junior Note is secured

13 by[] that certain second lien Deed of Trust, Security Agreement, Assignment of Rents and Fixture

14 Filing to be recorded in the real property records." (Intercreditor Agreement at 1.) This agreement

15 also included two lists of documents called the "Junior Loan Documents" and the "Senior Loan

16 Document," stating "true, correct and complete copies of which have been delivered to" Plaintiff

17 Hall and Defendant Ladera. (*Id.* at 6.) The documents were not attached to the Intercreditor

18 ///

19

20 [5] This provision underwent a few revisions before finally settling on its final form presented above.
   Initially, Plaintiff Hall proposed this clause, identical except without the introductory phrase

21 "[u]nder this agreement." (ECF No. 145 Ex. 21 ("Botts-Penta Email Exchange").) Penta proposed
   an introductory phrase to cover their preconstruction work: "Except as previously disclosed to

22 Assignee . . . ." (*Id.*) But Defendant Ladera proposed, the introductory phrase "[u]nder this agree-
   ment," to which Penta finally agreed. (*Id.*)

23 [6] The copy of the Junior Loan Agreement presented to the Court in these motions is not signed by
   the Parties, but the Parties do not dispute that they entered into this contract. (Junior Loan Agree-

24 ment at 67–69.) It contains signature blocks for Plaintiff Hall, Defendant Ladera, and Borrower.
   (*Id.*)

Agreement; the titles were merely listed. (*Id.* at Exs. B, C.) Among these lists are the Contractor's

Agreement, Deeds of Trust, and Junior Loan Agreement. (*Id.*)

  While there are some representations that at least suggest that Penta had not performed any

work on the Property, there are other representations to Defendant Ladera stating that such work

occurred. Defendant Ladera is owned and operated by two brothers, Jeffrey and James Pickett. On

March 28, 2014, six months before closing, James Pickett received an email from Penta's repre-

sentative and forwarded that email to Jeffrey Pickett regarding the preconstruction work, stating,

"What they spent the 3m on attached." (ECF No. 139 Ex. 10 ("March 28 Email").) Attached to the

email, was a spreadsheet detailing the preconstruction work that was completed, including that

Borrower still owed Penta $133,370. (*Id.*) It listed the following construction work that was per-

formed on the property leading up to that date:

| Construction | |
|---|---|
| Tower Roof Repair & Mansard Re-C | 428,577 |
| Model Room | 85,299 |
| Mobilization & Demolition | |
| Boiler Replacement | 55,965 |
| Tower Abatement | |
| Tree Removal | 10,100 |
| Total | 579,942 |

(*Id.*) In his deposition, James Pickett admits receiving this information from Penta's representative

and forwarding it to his brother, Jeffrey Pickett, but James does not admit to reviewing the attach-

ment. (ECF No. 139 Ex. 6 ("James Pickett Depo") at 215:2–16:11.)

  In April 2014, James and Jeffrey Pickett exchanged emails with an individual named Brad

Rencher with an attachment titled "Confidential Offering Memorandum for the Project." (ECF No.

139 Ex. 11 ("Confidential Memo").) They discussed the possibility of extending the mezzanine loan to Borrower. (*Id.* at LAD004398–99.) In the attached memorandum, the preconstruction was listed; "The Property was closed in Sept. 2013 to begin roof repairs, model room, and abatement work in preparation for the full construction start." (*Id.* at LAD004446.) Jeffrey Pickett testified he is "sure" that he had seen the Confidential Memo. (Jeffrey Pickett Depo at 253:11–54:3.)

In addition to these representations, Penta's Fed. R. Civ. P. 30(b)(6) witness, Mark Briggs, testified that the construction work was "obvious." (ECF No. 139 Ex. 12 ("Briggs Depo") at 51–53.) He stated, "Fences were up. Our trailers were out. I'm not sure how you cannot see that construction was -- that there was activity on the project." (*Id.*) He further affirmed that the "fencing had been out there since 2013 and was there well past September 2014." (*Id.* at 138.) The fencing also had signage, which read, "Construction Zone." (*Id.* at 139.) Both James and Jeffrey Pickett lived in the area and admit to seeing the Property frequently. (James Pickett Depo at 58; Jeffrey Pickett Depo at 50.)

James and Jeffrey Pickett both testified that they were not sure when they learned of the preconstruction work on the Property. For example, James Pickett said, in his deposition,

> Q. Sitting here today, do you recall whether you knew that work had been performed before Ladera Development funded a penny?
> A. No.
> Q. No, you don't recall?
> A. I do not recall.
> Q. Okay. So you could have been told that, and you just don't remember?
> A. Correct.

(James Pickett Depo at 149–50.) Likewise, for example, Jeffrey Pickett testified that he could not recall if he was given access to a "Dropbox," which contained an agreement such as one titled "Preconstruction Services Agreement" between Penta and Borrower. (Jeffrey Pickett Depo at 118.)

In early 2016, Borrower began to be unable to maintain its financial obligations, and Plaintiff Hall declared default. Shortly after this default, Penta filed suit against Plaintiff Hall in Nevada

state court, claiming that it had a mechanic's lien with priority over Plaintiff Hall's deed of trust. While this case between Penta and Plaintiff Hall was in the discovery phase, Borrower filed for Chapter 11 Bankruptcy on July 28, 2016.[7] The bankruptcy court merged the state court case with the ongoing bankruptcy proceeding. The court then established a $15,000,000 "Lien Litigation Reserve" to ensure at least partial satisfaction of the liens against the Property. Defendant Ladera litigated against Plaintiff Hall in bankruptcy court to attempt to recover at least partially on its $6,000,000 loan. (*See, e.g.*, ECF No. 140 Ex. A ("Ladera Bankruptcy Plan"); Jeff Pickett Depo at 283:2–284:8). Both Plaintiff Hall and Defendant Ladera also litigated together against Penta arguing their mechanics' lien was junior to their deeds of trust. (*See, e.g.*, ECF No. 140 Ex. H ("Motion for Settlement") at 10 of 31 ("While Hall continues to contest the priority of the liens of PENTA and the Penta Subcontractors and other subcontractors, Hall recognizes that there is significant risk that PENTA will prevail in the priority phase.").)[8]

Penta, Plaintiff Hall, Defendant Ladera, and various subcontractors entered into negotiations on the best way to split the $15,000,000 pot. During the negotiations, Defendant Ladera was excluded from negotiating.[9] The remaining parties to the negotiations agreed to a split of the money divvied up between Plaintiff Hall and the various contractors, and they moved the

---

[7] At this time, Plaintiff Hall had not loaned out the full twenty-nine million but only $20,421,136.25 to Borrower as Plaintiff Hall agreed to periodically advance funds under the loan as work was completed under the Construction Agreement. (*See, e.g.*, Construction Loan Agreement, Ex. 10, at 27, § 12)

[8] Exhibit H contains the motion as well as exhibits. For clarity, the page numbers cited in this Order reference the particular page out of the entire thirty-one pages in the file.

[9] Defendant Ladera claims as a fact that it was Plaintiff Hall who was successful in getting Defendant Ladera excluded from this process, but Defendant Ladera fails to offer competent evidence to this fact. It points to the deposition of Michael Jaynes, Plaintiff Hall's 30(b)(6) witness, but he said he was not sure who made that decision. (Michael Jaynes Depo at 150–51 ("I don't know who ultimately made that decision or if it was a joint decision.").) It also points to its unverified Answer, but the assertions in pleadings are generally not admissible evidence. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (holding that only pleadings submitted with personal knowledge and under oath may be used to defend against summary judgment).

bankruptcy court for approval of the settlement. In the Motion for Settlement, Plaintiff Hall represented that it would "exercise its rights under the Intercreditor Agreement with Ladera to insure Ladera's non-objection to the motion to approve this Agreement and the Motion to Dismiss, including but not limited to taking any action to enforce the Intercreditor Agreement, in the event Ladera breaches the terms of the Intercreditor Agreement." (*Id.* at 17 of 31.) Defendant Ladera did not contest the validity and enforceability of the Intercreditor Agreement, at this time or at all during the bankruptcy proceedings. The bankruptcy court approved the proposed settlement.

## LEGAL STANDARD

A court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only facts that affect the outcome are material. *Id.*

To determine when summary judgment is appropriate, courts use a burden-shifting analysis. On the one hand, if the party seeking summary judgment would bear the burden of proof at trial, then he can only satisfy his burden by presenting evidence that proves every element of his claim such that no reasonable juror could find otherwise assuming the evidence went uncontroverted. *Id.* at 252. On the other hand, when the party seeking summary judgment would not bear the burden of proof at trial, he satisfies his burden by demonstrating that the other party failed to establish an essential element of the claim or by presenting evidence that negates such an element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (Brennan J., concurring). A court should deny summary judgement if either the moving party fails to meet his initial burden or, if after he meets that burden, the other party establishes a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

**ANALYSIS**

The issues before this Court breakdown into two categories: whether the Intercreditor Agreement is valid and enforceable and, if so, how it applies to this case.[10]

## I. THE INTERCREDITOR AGREEMENT IS ENFORCEABLE

Before the Court addresses whether the parties breached the Intercreditor Agreement, the Court first determines whether it is a valid and enforceable contract. Defendant Ladera makes four contentions that would negate liability for its alleged breaches: the Intercreditor Agreement was the product of fraud, the Intercreditor Agreement was the product of a unilateral mistake, the Intercreditor Agreement was the product of a mutual mistake, and Defendant Ladera's obligations under the Intercreditor Agreement were excused because of the failure to complete a condition precedent.[11] Each argument relates to Defendant Ladera's claim it was not aware that preconstruction work had been done on the property and that its lien was arguably junior to the contractor's liens.

### A. Fraudulent Inducement

For its first claim, Defendant Ladera argues the Intercreditor Agreement was the result of fraudulent inducement. Defendant Ladera claims the Plaintiff Hall represented there had been no preconstruction work on the Property and that Defendant Ladera would have a second-in-line lien on the Property.

To prove a fraudulent inducement claim, a party must prove the following:

(1) [Plaintiff Hall] made a material misrepresentation; (2) [Plaintiff Hall] knew at the time that the representation was false or lacked knowledge of its truth; (3)

---

[10] In analyzing the substantive law of this case, this Court has held that the provision choosing Texas law in the Intercreditor Agreement is valid and binding for both claims. (ECF No. 154.)

[11] For the first time in its reply brief, Plaintiff Hall contends that Defendant Ladera's arguments for equitable relief are barred as untimely for failing to raise these arguments in a reasonable time, such as in the bankruptcy proceeding. (ECF No. 153 at 16.) The Court declines to consider this argument as it was not raised in the motion. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

[Plaintiff Hall] intended that [Defendant Ladera] should rely or act on the misrepresentation; (4) [Defendant Ladera] relied on the misrepresentation; and (5) [Defendant Ladera's]  reliance on the misrepresentation caused injury.

*Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019) (citing *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018)). The reliance must be "both actual and justifiable reliance." *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 558 (Tex. 2019) (quoting *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). A court may rule that a party's claim of "justifiable reliance is negated as a matter of law." *Id.* at 563 (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)).[12] "In an arm's length transaction, the party alleging fraud must have exercised ordinary care to protect its own interests and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience, and background warrant investigation." *Id.* Where the exercise of due diligence would reveal the existence of facts, the party "is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated; a failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *AKB Hendrick, LP v. Musgrave Enterprises, Inc.*, 380 S.W.3d 221, 232 (Tex. App. 2012).

The Court holds, as a matter of law, that Defendant Ladera would have known of the pre-construction work with an outstanding balance on the property through the exercise of due diligence, so Defendant Ladera's alleged reliance was not justifiable. Both James and Jeffrey Pickett admit to having access and sharing amongst themselves at least two documents, which state that

---

[12] In an older case, the Texas Supreme Court held, "Where one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983) (quoting *Isenhower v. Bell*, 365 S.W.2d 354, 357 (Tex. 1963)). Inasmuch as this ruling contradicts the recent *Mercedes-Benz USA* case, the Court holds that the Texas Supreme Court, the ultimate decider of Texas law, has departed from *Trenholm* and held that reliance must be justifiable.

Penta had performed preconstruction work on the Property starting in 2013. For example, the spreadsheet lists the construction work that was performed on the property in preparation of the main work and notes that Borrower still owed Penta over $100,000 for this work. (March 28 Email.) For this reason, summary judgment is proper.

In addition to the documents that they exchanged noting the work that Penta had performed, Jeffrey and James Pickett should have been aware of the ongoing construction of the Property at any time during their negotiations of the loan, because of the construction fences and work on the Property. They both admit they saw the Property frequently because they lived in the area. (James Pickett Depo at 58; Jeffrey Pickett Depo at 50.)

While the Pickett brothers do testify that they do not recall when they precisely learned of the work and there were indications that "no work" had been performed on the Property, a reasonable investigation would have revealed the preconstruction work. For this reason, they are charged with knowledge that Penta had performed this preconstruction work and that Penta arguably had a priority lien on the Property.[13] Defendant's Ladera claim of fraudulent inducement therefore fails as a matter of law.

Plaintiff Hall makes three additional arguments to contend summary judgment is proper on Defendant Ladera's claim of fraudulent inducement, which the Court finds less persuasive. First, Plaintiff Hall argues no reasonable juror could find that Defendant Ladera did not know of the preconstruction work. Plaintiff Hall points to the emails and attachments between the Pickett brothers, where there was mention of the preconstruction work; their deposition testimonies, where they frequently pleaded a lack of memory on key issues, even on when they learned of the preconstruction work for the first time; and the fences around the Property, which the Pickett brothers

---

[13] Defendant Ladera levies that Penta had a first-priority lien on the property, but this issue was never finally adjudicated as the bankruptcy case ended in settlement.

admit to seeing. Nonetheless, the Court finds that a reasonable juror could find that Defendant Ladera based upon an inference from the representations for contracts presented to Defendant Ladera such as the Contractor's Agreement, which states that no work had been performed on the Property.

Second, Plaintiff Hall next claims no reasonable juror could find that it never actually represented to Defendant Ladera that there was no work performed on the Property. The Court finds that a juror could reasonably disagree. For example, Plaintiff Hall was a signatory to the Contractor's Agreement, which contained the no-work paragraph, and Plaintiff Hall included it in the Intercreditor Agreement as a Senior Loan Document that was turned over to Defendant Ladera. Even if the Intercreditor Agreement did not expressly incorporate all of the terms of the Contractor's Agreement, this was a representation that no work was performed on the Property.

Third, Plaintiff Hall lastly contends no reasonable juror could find that Defendant Ladera was not harmed by the representations because it was never finally adjudicated that Penta was the most senior lien. But Defendant Ladera was unable to challenge the settlement because of the Intercreditor Agreement and a reasonable juror could find that Defendant Ladera would not have entered into nexus of agreements had it known of the preconstruction work. Nonetheless, the Court finds Plaintiff Hall's argument regarding justifiable reliance persuasive, which is alone sufficient for summary judgment on this claim.

### B.    Negligent Misrepresentation

Similar to Defendant Ladera's claim for fraudulent misrepresentation, it claims that Plaintiff Hall committed a negligent misrepresentation based on the same facts. For this claim, Defendant Ladera needs to show the following elements:

> (1) [Plaintiff Hall's] representation to [Defendant Ladera] in the course of [Plaintiff Hall's] business or in a transaction in which [Plaintiff Hall] had an interest; (2) [Plaintiff Hall's] providing false information for the guidance of others; (3)

[Plaintiff Hall's] failure to exercise reasonable care or competence in obtaining or communicating information; (4) [Defendant Ladera's] justifiable reliance on [Plaintiff Hall's] representation; and (5) [Plaintiff Hall's] negligent misrepresentation proximately causing the [Defendant Ladera's] injury.

*Willis v. Marshall*, 401 S.W.3d 689, 698 (Tex. App. 2013).

This claim suffers from the same defect noted above for the fraudulent misrepresentation claim. Namely, Defendant Ladera needs to show that its reliance on Plaintiff Hall's representations were justifiable, but no reasonable juror could make such a finding because of Defendant Ladera's notice. The Court therefore holds that summary judgment is proper on this claim as well.

C.      *Unilateral Mistake*

For this claim likewise, Defendant Ladera contends that it was unilaterally mistaken on whether there was preconstruction work on the Property and whether it held the second-in-place lien on the Property. A unilateral mistake of fact alone does not entail recission of a contract. *James T. Taylor & Son, Inc. v. Arlington Indep. Sch. Dist.*, 335 S.W.2d 371, 372–73 (1960). The parties agree that one claiming a unilateral mistake of fact must also satisfy the following additional elements under Texas law:

> (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense, i.e., recission must not result in prejudice to the other party except for the loss of his bargain.

*Id.* at 373. As stated above, the alleged mistake that Penta had performed preconstruction work, which arguably gave Penta a priority lien would have been avoided with the exercise of the ordinary care on Defendant Ladera's part.

While Defendant Ladera frames the issue in the same way, whether Penta's preconstruction work gave it a priority lien on the property is not an issue of fact but of law. *See Texas Nat. Bank of Baytown v. Harris Cty.*, 765 S.W.2d 823, 826 (Tex. App. 1988), *writ denied* (July 12, 1989)

("[A] mistake of law occurs where one cognizant of the facts reaches an erroneous conclusion as to the legal consequences or effect of those facts."). A unilateral mistake of law is only a ground for cancellation of a contract "if the mistake is chargeable to the inequitable conduct of the other party, such as the making of misleading or incorrect representations by one possessed of superior knowledge and in whom trust and confidence have properly been reposed." *Damstra v. Starr*, 585 S.W.2d 817, 820 (Tex. Civ. App. 1979).

This alleged mistake of law was never determined by any court, as the bankruptcy proceeding ended in settlement. But even assuming the veracity of the legal conclusion that Penta possessed a superior lien on the property, Plaintiff Hall was not one "whom trust and confidence [would] have properly been reposed." *Id.* For example, one's attorney would be such a person. *See, e.g.*, *id.* Defendant Ladera and Plaintiff Hall are both sophisticated parties who lent millions of dollars to Borrower. Defendant Ladera even hired counsel to investigate their risk associated with their loans at issue in this case. Plaintiff Hall cannot be punished for Defendant Ladera's failure to realize that Penta arguably had a mechanics lien on the Property, even if this Court concluded that Plaintiff Hall intentionally made misrepresentations. As such, this claim must also fail as a matter of law.

### D.   Mutual Mistake

Defendant Ladera only bases this claim on the mistaken fact that Penta arguably had a priority lien on the Property as it admits that Plaintiff Hall was aware of the preconstruction work. Again, Defendant Ladera frames this issue as one of fact as opposed to law, which is error. Texas courts do not recognize a mutual mistake of law as grounds for rescinding a contract. *Harris v. Sanderson*, 178 S.W.2d 315, 320 (Tex. Civ. App. 1944), *writ refused W.O.M.* (Apr. 11, 1944) ("[A] mutual mistake of law will not furnish grounds for avoiding a contract."); *Marsh v. Marsh*, ///

949 S.W.2d 734, 745 (Tex. App. 1997) ("[A] mutual mistake of law is not a ground for rescission or cancellation of a contract."). Summary judgment is therefore proper on this claim as well.

### E.      Failure to Comply with a Condition Precedent

Defendant Ladera lastly claims that the Intercreditor Agreement was subject to an unmet condition precedent and is therefore unenforceable. This claim fails in two regards: the condition precedent is not incorporated into the Intercreditor Agreement and similarly, the condition precedent is only in regard to Defendant Ladera having to lend—not its status as a junior lienholder.

For this claim, Defendant Ladera points to language of the Junior Loan Agreement between it and Borrower. In this agreement, under an article titled "CONDITIONS PRECEDENT TO LENDING," Defendant Ladera's lien "must be duly perfected and in a second priority lien position subject only to the deed of trust securing" Plaintiff's Hall's lien. (Junior Loan Agreement at 6.) This condition precedent from another agreement is the purported basis of this claim.

Defendant Ladera contends that the Intercreditor Agreement incorporated this condition precedent by reference. Specifically, the Intercreditor Agreement listed the Junior Loan Agreement as a one of the "Junior Loan Documents." (Intercreditor Agreement at Ex. C.) Regarding these Junior Loan Documents, the Intercreditor Agreement merely states the following:

> Junior Lender hereby represents, warrants and certifies to Senior Lender that, as of the date of this Agreement: (i) this Agreement has been duly authorized, executed and delivered by Junior Lender; (ii) the documents described on Exhibit C attached hereto are all of the Junior Loan Documents, true, correct and complete copies of which have been delivered to Senior Lender; (iii) the Junior Loan Documents have not been modified, amended or terminated except as disclosed on Exhibit C; and (iv) that none of the Junior Debt has been assigned or otherwise transferred to any person or entity and that the Junior Lender is the sole owner of all of the Junior Debt.
> . . .
> Senior Lender has reviewed the Junior Loan Documents identified on **Exhibit C** attached hereto and incorporated herein by this reference and hereby approves of and consents to the Junior Debt and such Junior Loan Documents.
> . . .

Without Senior Lender's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed, Junior Lender will not amend or modify the Junior Debt or the Junior Loan Documents in any way that will: (A) increase the maximum principal amount of the Junior Debt or increase the rate of interest or increase any of the fees, costs, or other amounts currently set forth in the Junior Loan Documents, (B) increase the amount or number of payments required by the Junior Loan Documents, (C) cross-default the Junior Debt with any loan other than the Senior Loan, (D) cross-collateralize the Junior Debt with any other loan, (E) add additional default provisions to any of the Junior Loan Documents or delete or shorten existing notice, grace and cure periods for any default, (F) shorten the maturity of the Junior Loan or any other portion of the Junior Debt, or (G) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge. Junior Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Junior Loan Documents (including any side letters, waivers or consents entered into, executed or delivered by Junior Lender) within a reasonable time after any of such applicable instruments have been executed by Junior Lender. Notwithstanding anything contained herein or in the Junior Loan Documents to the contrary and notwithstanding any amendment or modification to the Junior Loan Documents, the Junior Debt shall remain in all ways subordinate to the Senior Debt.

(Intercreditor Agreement at 6–7.)

Merely mentioning a document in a contract does not necessarily entail that the contract incorporated the terms of the document. *Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies*, 409 S.W.3d 181, 189 (Tex. App. 2013). The contractual language must rather show "that the parties to the agreement had knowledge of and assented to the incorporated terms." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 268 (5th Cir. 2011) (applying Texas law) (quoting 11 Williston on Contracts § 30:25 (4th ed. 1999)).

None of the language from the Intercreditor Agreement entail that Plaintiff Hall and Defendant Ladera intended to incorporate the condition precedent from the Junior Loan Agreement into the Intercreditor Agreement. In the Intercreditor Agreement, the parties merely state that Plaintiff Hall has reviewed true and accurate copies of the Junior Loan Agreement and Defendant

///

Ladera agrees it will not change the terms of the Junior Loan Agreement with Borrower without Plaintiff Hall's consent.

Additionally, the Junior Loan Agreement merely states the condition precedent is only in regard to its duty to lend money to Borrower. Indeed, it is a "CONDITION[] PRECEDENT *TO LENDING*." (Junior Loan Agreement at 6 (italics added).) There was therefore no agreement that, if Defendant Ladera was not the second-in-line lien, Defendant Ladera was excused from its obligations under the Intercreditor Agreement. As such, the Court holds summary judgment is proper on Defendant Ladera's final claim that the Intercreditor Agreement is not valid or enforceable.

## II.   APPLICATION OF THE INTERCREDITOR AGREEMENT

Holding the Intercreditor Agreement is valid and enforceable, the Court turns to the application to the facts of this case. The Court bifurcates this analysis into two parts whether Defendant Ladera breached its obligations in the bankruptcy proceedings and the instant proceedings and whether Plaintiff Hall is entitled to the insurance proceeds from Defendant Ladera's title insurance policy.

### A.   *Contesting Plaintiff Hall's Priority*

Plaintiff Hall alleges that Defendant Ladera's actions after Plaintiff Hall declared Borrower to be in default amounted to a number of breaches of the Intercreditor Agreement. For a breach of contract claim, a plaintiff must show (1) the existence of a valid contract, (2) the plaintiff's performance or tendered performance, (3) the defendant's breach of the contract, and (4) damages as a result of the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). The Court has already ruled that the Intercreditor Agreement is valid and enforceable, there is no contention that Plaintiff Hall has failed to perform its end of the bargain, and it is agreed that Plaintiff Hall was damaged. As such, this cause of action revolves around Defendant Ladera's alleged breaches of the contract.

As listed in the Factual Background of this Order, the Intercreditor Agreement imposed a number of restrictions on Defendant Ladera from interfering with Plaintiff Hall in the collection of its debt with Borrower. Despite these obligations, it is not contested that Defendant Ladera submitted a proposed plan in the bankruptcy proceeding that would have allowed for Defendant Ladera to receive some of the funds that would have otherwise gone to satisfy Plaintiff Hall's debt. This proposal by Defendant Ladera, as well as this instant proceeding in which Defendant Ladera contests the Intercreditor Agreement's validity, violate Defendant Ladera's following duties: (1) to not interfere in any manner with Plaintiff's ability to collect its debt from Borrower, (Intercreditor Agreement at 4), (2) to not "contest the validity, perfection, priority or enforceability" of Plaintiff Hall's senior debt, (*id.* at 5), (3) to not "bringing or consenting to any Insolvency Proceeding unless Senior Lender also joins therein or consents thereto in writing," (*id.* at 11), and (4) to not "contest the legality, validity or enforceability of" the Intercreditor Agreement. Defendant Ladera does not dispute that these actions constitute violations of the Intercreditor Agreement. In this respect, Plaintiff Hall's Motion for Summary Judgment is therefore granted.

### B.    Insurance Policy

Under the Intercreditor Agreement, Plaintiff Hall further claims that it is entitled to the title insurance policy that Defendant Ladera acquired from Old Republic. The agreement states:

> Junior Lender shall release insurance proceeds and condemnation awards, to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Loan Documents, in the same manner as Senior Lender, under, the terms and provisions of the Senior Loan Documents, so that no conflicts are created by and among Senior Lender, Junior Lender, or others in the application of insurance proceeds or condemnation awards. Senior Lender has the sole and exclusive right, as against Junior Lender, to adjust settlement of insurance claims under the insurance policies in the event of any covered loss or destruction. All proceeds of such insurance related to the Property shall inure to the Senior Lender, and Junior Lender shall cooperate (if necessary) in a reasonable manner in effecting the payment of such insurance proceeds to Senior Lender. In the event Senior Lender permits the Borrower to utilize the proceeds of insurance to replace

any part of the Property, the consent of Senior Lender shall be deemed to include the consent of Junior Lender.

(Intercreditor Agreement at 5.)

The Court holds that this section of the Intercreditor Agreement does not permit Plaintiff Hall to recover the title insurance that Defendant Ladera acquired to solely protect its interest in the Property. The insurance proceeds in this section are limited to proceeds that are "to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Loan Documents." (*Id.*) The insurance policy at issue was not to cover either. It is not to be applied for the restoration of the Property, and it was not to be applied to Plaintiff Hall's senior debt. It only covered Defendant Ladera's title. While the agreement goes onto say that "[a]ll proceeds" of "insurance related to the Property" shall be turned over to Plaintiff Hall in a reasonable manner, it is again to limited "such insurance" as defined in the first sentence of the paragraph. (*Id.*) The Court therefore holds that Plaintiff Hall is not entitled to summary judgment on its claim for these insurance proceeds.

## III.   SPECULATIVE DAMAGES

Defendant Ladera claims that Plaintiff Hall is not entitled to damages claiming that they are too speculative in regard to the additional fees Plaintiff Hall incurred from having to litigate against Defendant Ladera in the bankruptcy proceeding. Plaintiff Hall, however, is merely moving for summary judgment on the issue of liability of the claims and counterclaims. As such, the Court defers ruling on this argument until the issues of damages are properly before the Court.

///

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (ECF No. 139) is GRANTED IN PART and DENIED IN PART as described in this Order.

IT IS FURTHER ORDERED that Defendant's First Motion to Extend Time (ECF No. 144) is GRANTED.

IT IS FURTHER ORDERED that Defendant's First Motion for Leave to File Excess Pages (ECF No. 144) is GRANTED.

IT IS FURTHER ORDERED that Motions to Extend Time (ECF Nos. 141,148) are GRANTED.

IT IS SO ORDERED.

Dated March 29, 2022.

_____
ROBERT C. JONES
United States District Judge