UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| HALL CA-NV, LLC, a Texas limited liability company,<br><br>          Plaintiff,<br><br>     vs.<br><br>LADERA DEVELOPMENT, LLC, a Nevada limited liability company,<br><br>          Defendant. | 3:18-cv-00124-RCJ-CBC<br><br>**ORDER** |

On Plaintiff Hall's motion, this Court granted summary judgment on March 29, 2022, resolving most but not all of the issues in this case. (ECF No. 157.) Presently, before this Court are two matters: (1) Defendant Ladera's motion to reconsider the order on summary judgment or for certification for an interlocutory appeal and (2) whether the Court should grant partial summary judgment regarding which party is entitled to the proceeds of Defendant Ladera's title insurance.[1]

---

[1] Defendant also filed a motion for leave to file a supplemental brief in support of its motion for reconsideration. (ECF No. 170.) This comes after Defendant has filed its original motion and a reply. (ECF Nos. 159 and 162.) The Court finds that Defendant has not shown the necessary good cause for this supplemental filing. Its only argument that the Court should consider the additional brief is that the Court let the parties argue this motion at a hearing despite not noticing it for that hearing. (ECF No. 161.) This is not sufficient. There is no right to oral argument. Even more, there is no indication that Defendant could not have made the same points that it makes in the supplemental brief in its earlier filings. The Court therefore denies the motion for leave to supplement.

In the order on summary judgment, the Court held, among other things, that the Intercreditor Agreement between the parties is a valid and enforceable contract. Defendant Ladera challenges that conclusion. It contends that this Court erred by rejecting Defendant Ladera's argument that the Intercreditor Agreement was the product of fraud and mistake. The Court rejected this argument because, as a matter of law, Defendant Ladera could not justifiably rely on certain representations in the Intercreditor Agreement. Specifically, Defendant Ladera argues that Texas law does not allow for such a conclusion where a party relied upon the words of the contract. This Court is unpersuaded and denies this motion.

Turning to the second issue, on April 22, 2022, this Court held a hearing in which it indicated that it was considering granting partial summary judgment *sua sponte* in favor of Defendant Ladera to hold that Defendant Ladera is entitled to the proceeds of the title insurance policy as a matter of law. (ECF Nos. 161, 165.) The parties have each submitted an opening brief regarding this issue as well as a response. (ECF Nos. 163, 164, 166, 167.) After carefully considering these filings, the Court is persuaded by Plaintiff Hall and holds that Plaintiff Hall is entitled to the insurance proceeds.

This Order should resolve all but one outstanding issue. This Court has held that Plaintiff Hall has successfully shown Defendant Ladera is liable for breach of contract for contesting Plaintiff Hall's superior loan status in the Bankruptcy Court. Plaintiff Hall's damages for this breach remain unresolved. Plaintiff Hall contends that these damages may be calculated through a "prove-up evidentiary hearing." (*See* ECF No. 153 at 18.) However, as these damages are "an element of damages under a contract," they need to go to trial even though the damages are for attorney fees and litigation costs. *J.R. Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1116 (10th Cir. 2009) (quoting 10 J. MOORE, *Moore's Federal Practice* § 54.171(1)(a) (3d ed. 2008)); *accord Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1342–43 (Fed. Cir. 2013). For

this reason, this case shall proceed to a bench trial[2] on the issue of damages, and the parties shall file a proposed joint pretrial order within thirty days of the entry of this Order. The proposed joint pretrial order should indicate whether there are any further issues for trial.

## FACTUAL BACKGROUND

New Cal-Neva Lodge, LLC ("Borrower") previously owned a certain property that straddles the border of Nevada and California located in Crystal Bay, Washoe County, Nevada and in Placer County, California (the "Property"). Borrower acquired the Property in February 2013 and operated a resort hotel on it known as the "Cal-Neva Lodge."

On June 26, 2013, Borrower and Plaintiff Hall CA-NV, LLC ("Plaintiff Hall") entered into a letter of engagement by which Plaintiff Hall tentatively agreed to provide Borrower with a loan for $29,000,000 "to pay expenditures related to the renovation of improvements on the Property." (ECF No. 53 Ex. 2 ("June 26 Letter").) Per the letter, final approval of the loan would be based upon certain conditions being met such as a renovation plan approved by Plaintiff Hall. (*Id.*)

Over the next fifteen months, Plaintiff Hall and Borrower negotiated the terms of the loan, reviewed construction plans, and made modifications before the loan closed on September 30, 2014. (*See* ECF No. 139 Ex. 1 ("Construction Loan Agreement").) Under this agreement, Plaintiff Hall would loan the money out over time with monthly installments as needed. (*Id.* § 12.)

During the negotiation period, the parties also discussed with Defendant Ladera Development LLC ("Defendant Ladera") about acquiring additional funds to ensure there would be sufficient moneys to complete the construction project. Borrower agreed with Defendant Ladera that Defendant Ladera would contribute a $6,000,000 mezzanine loan to Borrower for the construction project, which also closed on September 30, 2014. (ECF No. 139 Ex. 3 ("Junior Loan Agreement").) Defendant Ladera indicated that the loan was worth the risk involved if it were to

---

[2] Neither party has filed a jury demand.

be second only to Plaintiff Hall's loan, which Plaintiff Hall acknowledged in an internal memorandum dated September 15, 2014. (ECF No. 145 Ex. 11 ("Hall Memo") at 2 ("Ladera is requiring a 2nd lien secured by the property, and a pledge of the Borrower partnership interest.").)

Before the September 30, 2014 closing date, Plaintiff Hall and Defendant Ladera entered into a separate agreement, whereby Plaintiff Hall's loan would be senior to Defendant Ladera's loan. (ECF No. 139 Ex. 4 ("Intercreditor Agreement").) Relevant to this case, the Intercreditor Agreement imposed a number of duties onto Defendant Ladera:

> 1. "Junior Lender shall not in any manner interfere with Senior Lender's security interests in the Property unless and until all of the Senior Debt is no longer outstanding." (*Id.* at 4.)
> 2. "Junior Lender agrees that it will not at any time contest the validity, perfection, priority or enforceability of any of the Senior Debt, any of the Senior Loan Documents, or any of the liens and security interests of Senior Lender in the Property or other collateral securing the Senior Debt." (*Id.* at 5.)
> 3. "[Junior Lender will] not take any action or vote in any way so as to (A) contest the legality, validity or enforceability of this Agreement or any Senior Loan Document . . . ." (*Id.* at 11.)
> 4. "Notwithstanding anything to the contrary contained in this Agreement, during the continuance of any Insolvency Proceeding, the Senior Debt shall first be indefeasibly paid and satisfied in full in cash before any payment or distribution of cash or other property is made upon the Junior Debt. In any Insolvency Proceeding, any payment or distribution which may be payable or deliverable with respect to the Junior Debt shall be paid or delivered directly to Senior Lender for application to the payment and satisfaction of the Senior Debt unless and until the Senior Debt shall have been indefeasibly paid and satisfied in full in cash." (*Id.* at 10.)
> 5. "If applicable, Junior Lender agrees to vote for any plan of reorganization approved by Senior Lender in respect of Borrower in any Insolvency Proceeding respecting Borrower; provided, however, that Senior Lender agrees not to unreasonably withhold or delay its consent to Junior Lender's voting for a different plan of reorganization if (i) the different plan is at least as beneficial to Senior Lender (including without limitation with respect to Senior Lender's payment, lien and remedy rights thereunder) as the plan approved by Senior Lender, and (ii) Junior Lender agrees in writing (A) that any payments received by Junior Lender by virtue of such Insolvency Proceeding will be held by Junior Lender in trust for the benefit of Senior Lender until such time as the Senior Debt is satisfied in full, and (B) if the Senior Debt will not be satisfied in full by virtue of such Insolvency Proceeding, promptly pay over to Senior Lender the payments so held in trust up to the amount of the deficiency." (*Id.*)
> 6. "Junior Lender agrees not to oppose any post-petition motion filed or supported by Senior Lender, including, without limitation, motions for adequate protection

with respect to the ordinary course of its business or for post-petition borrowing from Senior Lender." (*Id.* at 12.)

7. "Junior Lender shall release insurance proceeds and condemnation awards, to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Loan Documents, in the same manner as Senior Lender, under, the terms and provisions of the Senior Loan Documents, so that no conflicts are created by and among Senior Lender, Junior Lender, or others in the application of insurance proceeds or condemnation awards. Senior Lender has the sole and exclusive right, as against Junior Lender, to adjust settlement of insurance claims under the insurance policies in the event of any covered loss or destruction. All proceeds of such insurance related to the Property shall inure to the Senior Lender, and Junior Lender shall cooperate (if necessary) in a reasonable manner in effecting the payment of such insurance proceeds to Senior Lender. In the event Senior Lender permits the Borrower to utilize the proceeds of insurance to replace any part of the Property, the consent of Senior Lender shall be deemed to include the consent of Junior Lender." (*Id.* at 5.)

To protect their respective interests in the Property, both Plaintiff Hall and Defendant Ladera acquired title insurance policies. Plaintiff Hall purchased a title insurance policy from Old Republic National Title Insurance Company ("Old Republic"), which failed to cover any superior mechanics' lien arising from Penta's prior work on the Property. (ECF No. 145 Ex. 22 ("Hall Insurance Policy") at LAD006948, LAD006973 (omitting standard coverage for "[t]he lack of priority of the lien of the Insured Mortgage upon the Title . . . as security for each and every advance of proceeds of the loan secured by Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the land when the improvement or work . . . .") Defendant Ladera also purchased title insurance from Old Republic. (ECF No. 145 Ex. 23 ("Ladera Insurance Policy").) Unlike Plaintiff Hall's Insurance Policy, Defendant Ladera's insurance policy did cover mechanics' liens. (*Id.*)

Defendant Ladera hired a law firm, Hopkins Carley, a law corporation. Defendant Ladera hired these attorneys to review the Intercreditor Agreement prior to entering the mezzanine loan to make sure it was enforceable, acceptable to Defendant Ladera, and to explain the terms to it, as

///

well as to review the loan documents between Plaintiff Hall and the Borrower, and Plaintiff Hall and Penta. (ECF No. 139 Ex. 5 ("Jeffrey Pickett Depo") at 86:11–87:25.)

Before the parties closed the loans in September 2014, some construction work was performed on the Property from fall 2013 to January 2014. This work included the following: work on a model room, repair the roof, replace the boiler, remove trees, and abatement work for asbestos. (ECF No. 145 Ex. 5 ("Jaynes Depo") at 89:2–22.) To complete this work, Borrower hired the PENTA Building Group ("Penta"). Plaintiff Hall's 30(b)(6) witness, Michael Jaynes, admits that he was aware of this construction work as early as late 2013. (*Id.* at 63:8–11.)

Under Nevada Revised Statutes Chapter 108, contractors generally enjoy a lien on properties on which they have performed work. Nev. Rev. Stat. § 108.225. These liens are prior over subsequent deeds of trust and mortgages. Nev. Rev. Stat. §§ 108.2453, 108.2457. As such, Penta arguably had a first-in-line lien on the Property, giving Penta's lien priority over Plaintiff Hall's and Defendant Ladera's deeds of trust.

Between the 2013 work and the closing of the loans, Plaintiff Hall and Penta made several representations that at least appeared to posit that Penta had not performed any work on the Property before the closing of the loans. First, there was a document titled "Contractor's Agreement and Consent to Assignment of Construction Documents," which Penta and Plaintiff Hall signed on September 29, 2014. (ECF No. 145 Ex. 17 ("Contractor's Agreement").) This document states:

> Under the Agreement, no work of any kind (including the destruction or removal of any existing improvements, site work, clearing, grubbing, draining, or fencing) has been commenced or performed on the property described in the Agreement and no equipment, or materials have been delivered to the property described in the agreement for any purpose whatsoever.

(*Id.* at 1.) The Contractor's Agreement defines the term "Agreement" collectively to include "any other agreements executed by [Penta] and [Borrower] in connection with the [Property]." (*Id.*)

Second, the deeds of trust providing Defendant Ladera with a lien on the Property list Defendant Ladera as having a "second priority lien." (ECF No. 145 Ex. 13 ("Deeds of Trust") at 1.) This is in spite of the fact that Penta arguably had the first-in-line lien, making Plaintiff Hall the second-in-line lien and Defendant Ladera the third-in-line lien.

Third, several places in the Junior Loan Agreement indicate that Defendant Ladera will be granted "a second priority lien on the" Property. (Junior Loan Agreement at 2.) Under an article titled "CONDITIONS PRECEDENT TO LENDING," Defendant Ladera's lien "must be duly perfected and in a second priority lien position subject only to the deed of trust securing" Plaintiff Hall's lien. (*Id.* at 6.)

Fourth, the Intercreditor Agreement states that Defendant Ladera's "Junior Note is secured by[] that certain second lien Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing to be recorded in the real property records." (Intercreditor Agreement at 1.) This agreement also included two lists of documents called the "Junior Loan Documents" and the "Senior Loan Document," and stated that "true, correct and complete copies of which have been delivered to" Plaintiff Hall and Defendant Ladera. (*Id.* at 6.) The documents were not attached to the Intercreditor Agreement; the titles were merely listed. (*Id.* at Exs. B, C.) Among these lists are the Contractor's Agreement, Deeds of Trust, and Junior Loan Agreement. (*Id.*)

While there are some representations that at least suggest that Penta had not performed any work on the Property, there are other representations to Defendant Ladera explicitly stating that such work occurred. For example, Defendant Ladera is owned and operated by two brothers, Jeffrey and James Pickett. On March 28, 2014, six months before closing, James Pickett received an email from Borrower's representative and forwarded that email to Jeffrey Pickett regarding the preconstruction work, stating, "What they spent the 3m on attached." (ECF No. 139 Ex. 10 ("March 28 Email").) Attached to the email, was a spreadsheet detailing the preconstruction work

that was completed, including that Borrower still owed Penta $133,370. (*Id.*) It listed the following construction work that was performed on the property leading up to that date:

| Construction | |
|---|---:|
| Tower Roof Repair & Mansard Re-C | 428,577 |
| Model Room | 85,299 |
| Mobilization & Demolition | - |
| Boiler Replacement | 55,965 |
| Tower Abatement | - |
| Tree Removal | 10,100 |
| Total | 579,942 |

(*Id.*) In his deposition, James Pickett admits receiving this information from Borrower's representative and forwarding it to his brother, Jeffrey Pickett, but James does not admit to reviewing the attachment. (ECF No. 139 Ex. 6 ("James Pickett Depo") at 215:2–16:11.)

In April 2014, James and Jeffrey Pickett exchanged emails with an individual named Brad Rencher containing an attachment titled "Confidential Offering Memorandum for the Project." (ECF No. 139 Ex. 11 ("Confidential Memo").) They discussed the possibility of extending the mezzanine loan to Borrower. (*Id.* at LAD004398–99.) In the attached memorandum, the preconstruction was listed; "The Property was closed in Sept. 2013 to begin roof repairs, model room, and abatement work in preparation for the full construction start." (*Id.* at LAD004446.) Jeffrey Pickett testified that he is "sure" that he had seen the Confidential Memo. (Jeffrey Pickett Depo at 253:11–54:3.)

In addition to these representations, Penta's Fed. R. Civ. P. 30(b)(6) witness, Mark Briggs, testified that the construction work was "obvious." (ECF No. 139 Ex. 12 ("Briggs Depo") at 51–53.) He stated, "Fences were up. Our trailers were out. I'm not sure how you cannot see that construction was -- that there was activity on the project." (*Id.*) He further affirmed that the "fencing had been out there since 2013 and was there well past September 2014." (*Id.* at 138.) The

fencing also had signage, which read, "Construction Zone." (*Id.* at 139.) Both James and Jeffrey Pickett lived in the area and admitted to seeing the Property frequently. (James Pickett Depo at 58; Jeffrey Pickett Depo at 50.)

James and Jeffrey Pickett both testified that they were not sure when they learned of the preconstruction work on the Property. For example, James Pickett said, in his deposition,

> Q. Sitting here today, do you recall whether you knew that work had been performed before Ladera Development funded a penny?
> A. No.
> Q. No, you don't recall?
> A. I do not recall.
> Q. Okay. So you could have been told that, and you just don't remember?
> A. Correct.

(James Pickett Depo at 149–50.) Likewise, for example, Jeffrey Pickett testified that he could not recall if he was given access to a "Dropbox," which contained an agreement such as one titled "Preconstruction Services Agreement" between Penta and Borrower. (Jeffrey Pickett Depo at 118.)

In early 2016, Borrower fell behind on its financial obligations, and Plaintiff Hall declared default. Shortly after this default, Penta filed suit against Plaintiff Hall in Nevada state court, claiming that it had a mechanics' lien with priority over Plaintiff Hall's deed of trust. While this case between Penta and Plaintiff Hall was in the discovery phase, Borrower filed for Chapter 11 Bankruptcy on July 28, 2016. The bankruptcy court merged the state court case with the ongoing bankruptcy proceeding. The court then established a $15,000,000 "Lien Litigation Reserve" to ensure at least partial satisfaction of the liens against the Property. Defendant Ladera litigated against Plaintiff Hall in bankruptcy court to attempt to recover at least partially on its $6,000,000 loan. (*See, e.g.*, ECF No. 140 Ex. A ("Ladera Bankruptcy Plan"); Jeff Pickett Depo at 283:2–284:8). Both Plaintiff Hall and Defendant Ladera also litigated together against Penta arguing the mechanics' lien was junior to the deeds of trust. (*See, e.g.*, ECF No. 140 Ex. H ("Motion for Settlement") at 10 of 31 ("While Hall continues to contest the priority of the liens of PENTA and

the Penta Subcontractors and other subcontractors, Hall recognizes that there is significant risk that PENTA will prevail in the priority phase.").)

Penta, Plaintiff Hall, Defendant Ladera, and various subcontractors entered into negotiations on the best way to split the $15,000,000 pot. But shortly into these negotiations, the parties were able to exclude Defendant Ladera from participating based upon the Intercreditor Agreement. The remaining parties to the negotiations agreed to a split of the money divvied up between Plaintiff Hall and the various contractors, and they moved the bankruptcy court for approval of the settlement. In the Motion for Settlement, Plaintiff Hall represented that it would "exercise its rights under the Intercreditor Agreement with Ladera to insure Ladera's nonobjection to the motion to approve this Agreement and the Motion to Dismiss, including but not limited to taking any action to enforce the Intercreditor Agreement, in the event Ladera breaches the terms of the Intercreditor Agreement." (*Id.* at 17 of 31.) Defendant Ladera did not contest the validity and enforceability of the Intercreditor Agreement at that time or at all during the bankruptcy proceedings. The bankruptcy court approved the proposed settlement.

## ANALYSIS

The Court will first address Defendant Ladera's motion and then turn to whether summary judgment is proper.

**I.    *Defendant Ladera's motion for reconsideration or certification of interlocutory appeal.***

For this motion, Defendant Ladera essentially argues that under Texas law whether a party exercised justifiable reliance cannot be decided as a matter of law where the party relied upon the terms of the contract. The Court considered and rejected that argument in its order on summary judgment and does so again here.

LR 59-1 controls the Court's determination of Defendant Ladera's request for reconsideration. It states, in pertinent part:

> A party seeking reconsideration under this rule must state with particularity the points of law or fact that the court has overlooked or misunderstood. Changes in legal or factual circumstances that may entitle the movant to relief also must be stated with particularity. The court possesses the inherent power to reconsider an interlocutory order for cause, so long as the court retains jurisdiction. Reconsideration also may be appropriate if (1) there is newly discovered evidence that was not available when the original motion or response was filed, (2) the court committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law. . . . Motions for reconsideration are disfavored. A movant must not repeat arguments already presented unless (and only to the extent) necessary to explain controlling, intervening law or to argue new facts. A movant who repeats arguments will be subject to appropriate sanctions.

Defendant Ladera relies on *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553 (Tex. 2019). It claims that the Texas Supreme Court "emphasized that '[w]hether a party's actual reliance is also justifiable is ordinarily a fact question.' It held only that there is no justifiable reliance as a matter of law where 'an oral representation . . . is directly contradicted by the express, unambiguous terms of a written agreement between the parties.'" (ECF No. 159 (internal citations omitted) (quoting *Mercedes-Benz*, 583 S.W.3d at 558–59).) From this and similar citations, Defendant Ladera concludes, "This is not a situation where [Defendant Ladera] relied on an oral representation that contradicted the contract – and thus, it was error to find that [Defendant Ladera]'s reliance was not justified as a matter of law." (*Id.*)

Defendant Ladera's quotations of *Mercedes-Benz* fail to capture the meaning of that case. To quote the first sentence in its entirety shows that summary judgment may be proper more frequently than Defendant Ladera suggests: "Whether a party's actual reliance is also justifiable is ordinarily a fact question, *but the element may be negated as a matter of law when circumstances exist under which reliance cannot be justified.*" *Mercedes-Benz*, 583 S.W.3d at 558 (emphasis added). And while the *Mercedes-Benz* Court held that a party claiming fraud cannot justifiably rely upon such fraudulent claims where the claims are directly contradicted by the terms of the contract, it never held this was the only possible instance where justifiable reliance may be negated

as a matter of law. Rather, it stated, "Although [*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 660 n.2 (Tex. 2018)] discusses both direct contradiction and other red flags, it does not require them both to negate justifiable reliance. In fact, we noted just the opposite, stating that either could be sufficient to preclude justifiable reliance."[3] *Id.* at 559. As such, the Texas Supreme Court has recently affirmed that a direct contradiction is *not* required to find that justifiable reliance is precluded as a matter of law.

As discussed in this Court's order granting summary judgment, there were a number of "red flags" present here. To avoid reiterating the Court's reasoning in that order, it will point to one that is particularly telling: the email between Defendant Ladera's two owner-managers with an attached spreadsheet that noted Penta performed pre-construction work and was owed an outstanding balance. The Court therefore did not err.[4]

Defendant Ladera alternatively requests that this Court certify an interlocutory appeal under 28 U.S.C. § 1292(b). This statute provides that such an appeal may be taken where a district court certifies "(1) that there [is] a controlling question of law, (2) that there [is] substantial grounds for difference of opinion, and (3) that an immediate appeal may materially advance the ultimate termination of the litigation." *In re Cement Antitrust Litig. (MDL No. 296)*, 673 F.2d 1020, 1026 (9th Cir. 1981), *cause dismissed sub nom. Arizona v. U.S. Dist. Ct. for the Dist. of Arizona*, 459 U.S. 961 (1982), and *aff'd sub nom. Arizona v. Ash Grove Cement Co.*, 459 U.S. 1190 (1983). If Defendant Ladera were correct in its interpretation of Texas law, it would affect whether summary

---

[3] "Either 'red flags' alone or direct contradiction alone can negate justifiable reliance as a matter of law." *Orca Assets*, 546 S.W.3d at 660 n.2 (collecting cases).

[4] Defendant Ladera raises the same argument to claim that the Court erred in determining Defendant Ladera could not rely on a unilateral mistake of fact claim. Defendant Ladera again argues that it mistakenly believed that Penta had not yet started performing construction work. This claim fails for the same reason, that is Defendant Ladera must show it exercised ordinary care, which is a similar test to justifiable reliance. As such, the Court correctly held that claim should not proceed as a matter of law.

judgment is appropriate, so there is a question of controlling law. The Court however finds that the other two elements are not present here. The Texas Supreme Court has twice disavowed Defendant Ladera's interpretation of the law in the past five years, so there are not substantial grounds for its difference of opinion. More importantly, as this case is prepared to proceed to a short bench trial, an immediate appeal will not materially advance the ultimate termination of this litigation.

## II.     The Court's motion for partial summary judgment.

Plaintiff Hall contends that it is entitled to the Ladera Insurance Policy proceeds based upon the Intercreditor Agreement Section 3(a), which reads:

> Junior Lender shall release insurance proceeds and condemnation awards, to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Loan Documents, in the same manner as Senior Lender, under, the terms and provisions of the Senior Loan Documents, so that no conflicts are created by and among Senior Lender, Junior Lender, or others in the application of insurance proceeds or condemnation awards. Senior Lender has the sole and exclusive right, as against Junior Lender, to adjust settlement of insurance claims under the insurance policies in the event of any covered loss or destruction. All proceeds of such insurance related to the Property shall inure to the Senior Lender, and Junior Lender shall cooperate (if necessary) in a reasonable manner in effecting the payment of such insurance proceeds to Senior Lender. In the event Senior Lender permits the Borrower to utilize the proceeds of insurance to replace any part of the Property, the consent of Senior Lender shall be deemed to include the consent of Junior Lender.

(Intercreditor Agreement at 5.)

In its order analyzing Plaintiff Hall's motion for summary judgment, this Court held the following regarding the Ladera Insurance Policy:

> The Court holds that [Section 3(a)] of the Intercreditor Agreement does not permit Plaintiff Hall to recover the title insurance that Defendant Ladera acquired to solely protect its interest in the Property. The insurance proceeds in this section are limited to proceeds that are "to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Loan Documents." (*Id.*) The insurance policy at issue was not to cover either. It is not to be applied for the restoration of the Property, and it was not to be applied to Plaintiff Hall's senior

debt. It only covered Defendant Ladera's title. While the agreement goes onto say that "[a]ll proceeds" of "insurance related to the Property" shall be turned over to Plaintiff Hall in a reasonable manner, it is again to limited "such insurance" as defined in the first sentence of the paragraph. (*Id.*) The Court therefore holds that Plaintiff Hall is not entitled to summary judgment on its claim for these insurance proceeds.

Upon the argumentation presented in the recent briefs and at oral argument, the Court is persuaded to reconsider this holding and adopt Plaintiff Hall's interpretation of the contract—that Plaintiff Hall is entitled to the insurance proceeds from the Ladera Insurance Policy.

A court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only facts that affect the outcome are material. *Id.* A court may also grant summary judgment to a nonmovant sua sponte if the Court provides "reasonable notice [to the litigant] that the sufficiency of his or her claim will be in issue." *Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1092 (9th Cir. 2004) (citing Fed. R. Civ. P. 56(f)).

To determine when summary judgment is appropriate, courts use a burden-shifting analysis. When the party seeking summary judgment would not bear the burden of proof at trial, he satisfies his burden by demonstrating that the other party failed to establish an essential element of the claim or by presenting evidence that negates such an element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (Brennan J., concurring). A court should deny summary judgement if either the moving party fails to meet his initial burden or, if after he meets that burden, the other party establishes a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

///

1  The Court revisits this analysis by first examining Section 3(a). Plaintiff Hall contends that the first sentence contains two nonessential, dependent clauses which are to be understood as describing how the insurance proceeds are to be paid as opposed to limiting the type of insurance proceeds to which the provision applies. (ECF No. 164 at 8–14.) It provides the following graphic:



(*Id.* at 10.) Defendant Ladera posits that Dependent Clause No. 1 limits the type of insurance proceeds to which this provision applies as opposed to how the insurance proceeds is to be applied.

Defendant Ladera contends that Plaintiff Hall's interpretation of the first sentence of Section 3(a) is strained because such a reading allegedly finds the dependent clauses meaningless. It is true that under Texas law, courts "must read all parts of the contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) (citation omitted); *see also Aery v. Hoskins, Inc.*, 493 S.W.3d 684, 692 (Tex. App. 2016) ("Construction and interpretation must give effect to all provisions so none will be rendered meaningless."). But the dependent clauses are not meaningless under Plaintiff Hall's interpretation; they state how to apply the insurance proceeds under Plaintiff Hall's interpretation.

///

This provision of Section 3(a), standing alone, is amenable to both parties' interpretations. However, reading the contract as a whole, the Court is persuaded that Plaintiff Hall's interpretation is the only reasonable one.

Plaintiff Hall points to several other provisions in the Intercreditor Agreement that confirm it is entitled to the Ladera Insurance Policy proceeds. Plaintiff Hall relies on Section 1(b), which states, in pertinent part:

> The holder of the Senior Debt shall first be finally and irrevocably paid in cash an aggregate amount equal to the principal of the Senior Loan, accrued and unpaid interest due thereon, and all other costs, fees, expenses and/or obligations now or hereafter owning thereunder, before any payment of any character, whether in cash, securities or other property, shall be made on account of the Junior Debt or otherwise to or for the benefit of the holder or holders of Junior Debt . . . .

(Intercreditor Agreement at 3.) The Ladera Insurance Policy is undoubtedly a payment "made on account of the Junior Debt or otherwise to or for the benefit of the holder of Junior Debt," so it cannot be paid towards Defendant Ladera as the Junior Debt holder but must rather be paid towards Plaintiff Hall as the Senior Debt holder.

Defendant Ladera contends that this interpretation of the provision, while technically correct, is nonetheless not a reasonable reading of the contract. The Texas Supreme Court considered a somewhat analogous issue in *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). In that case, the court considered whether the phrases "arising from," "with respect to," and "attributable to" necessitated a but-for analysis no matter how attenuated the result. *Id.* The court held that, while the party advocating for a but-for analysis was correct in a similar overly technical, metaphysical sense, the reasonable reading was to imply a "requisite degree of connectedness." *Id.*

The instant case is distinguishable from *Plains Expl. & Prod. Co.* There the Texas Supreme Court found that the words "arising from," "with respect to," and "attributable to" implied a

requisite degree of connectedness. Here, however, Defendant Ladera, in essence, is claiming that the words of the provision really do not mean what they state. The provision states that it applies to "*any* payment of *any* character" that is "made on account of the Junior Debt or otherwise to or for the benefit of the holder or holders of Junior Debt." The plain meaning of these terms includes insurance proceeds.

Further confirming this interpretation, Plaintiff Hall points to two other provisions, which show that Plaintiff Hall was to be paid in full first before Defendant Ladera was to collect on its debt. Section 3(b) reads:

> If Junior Lender shall at any time hereafter acquire, by indemnification, subrogation (for example, by payment of real estate taxes) or otherwise, any lien, right, title or other interest in or to the Property, that lien, right, title or other interest shall automatically be subject and subordinate to the Senior Security Instrument as provided herein. If due to any applicable law or otherwise, such lien, right, title or other interest does not automatically subordinate to the Senior Security Instrument, Junior Lender agrees to execute any document or subordination that effects the intent of the above sentence and this Agreement.

(Intercreditor Agreement at 5.) Plaintiff Hall claims that insurance policies are contracts of indemnity, the insurance proceeds are "subject and subordinate to the Senior Security Instrument." While this is limited to interests "in or to the Property," this provision further shows the nature of the contract; that is, Defendant Ladera is surrendering its interests to Plaintiff Hall's senior debt.

Plaintiff Hall next turns to Section 1(a), which reads, in pertinent part:

> Junior Lender hereby intentionally waives, relinquishes and subordinates the priority and superiority of the Junior Loan Documents and the rights, privileges and powers of Junior Lender thereunder, including without limitation rights to any insurance proceeds or condemnation award and similar rights or interests of Junior Lender under the Junior Loan Documents, in favor of the Senior Security Instrument and any instrument modifying or amending the same or entered into in substitution or replacement thereof.

(Intercreditor Agreement at 3.) Plaintiff Hall relies on the language that Defendant Ladera relinquishes insurance proceeds but neglects to include that this relinquishment is limited to

insurance proceeds of Defendant Ladera "under the Junior Loan Documents." The Ladera Insurance Policy was not included in the Junior Loan Documents, and Defendant Ladera was not required to purchase the title insurance under the Junior Loan Documents. So, this provision does not govern whether Hall is entitled to the proceeds of Ladera's title insurance. However, this provision shows the overall nature of the contract, which accords with Plaintiff Hall's interpretation of Section 1(b) and Section 3(a) that Plaintiff Hall is entitled to the Ladera Insurance Policy Proceeds. The Court therefore grants Plaintiff Hall summary judgment on this issue.

## CONCLUSION

IT IS HEREBY ORDERED that Defendant Ladera's Motion for Reconsideration (ECF No. 159) is DENIED.

IT IS FURTHER ORDERED that Defendant Ladera's Motion for Leave to Supplement (ECF No. 170) is DENIED.

IT IS FURTHER ORDERED that the Court grants partial summary judgment in favor of Plaintiff Hall and holds that Plaintiff Hall is entitled to the proceeds of the title insurance policy issued by Old Republic National Title Insurance Company to Defendant Ladera. (ECF No. 145 Ex. 23).

IT IS FURTHER ORDERED that the parties shall file the joint pretrial order within thirty days of the entry of this Order.

IT IS SO ORDERED.

Dated July 26, 2022.

_____
ROBERT C. JONES
United States District Judge